[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 17, 2001
THOMAS K. KAHN
CLERK

No. 99-4166

D.C. Docket No. 96-00443-1-CR-10-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GLORIA MARIA DIAZ, SERGIO
ECHEVARRIA, a.k.a. Papo, a.k.a. Sylvio, et al.,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Florida

**(April 17, 2001)**

Before BARKETT and WILSON, Circuit Judges, and DOWD[*], District Judge.

DOWD, District Judge:

**I.    Introduction**

_____

[*] Honorable David D. Dowd, Jr., U.S. District Judge for the Northern District of Ohio, sitting by designation.

This appeal follows the conviction of the six appellants, Gloria Diaz ("Diaz"), Jose Blas Lopez ("Lopez"), Sergio Echevarria ("Echevarria"), Eladio Munoz ("Munoz"), Orestes Hernandez ("Orestes Hernandez") and Ismael Camacho ("Camacho") in a single jury trial that focused on three separate terrifying kidnapping and extortion episodes in the Miami area spread over a seventeen month period. The ensuing sentences ranged from a low of 188 months for Lopez to a high of 1145 months for Camacho.

The trial was based on the fourth superseding indictment. The eleven counts included the crime of conspiracy to commit a Hobbs Act violation, a series of substantive Hobbs Act violations, a series of carjackings in violation of 18 U.S.C. § 2119, and a series of 18 U.S.C. § 924(c) violations (hereinafter § 924(c)).[1]

The pivotal event from a prosecutorial standpoint was the arrest of Ilvigio Hernandez ("Ilvigio") on January 12, 1996 following the failed attempt by Echevarria,

---

[1]The first indictment (R.15) was filed on April 22, 1996 and named only Ilvigio Hernandez, Humberto Munoz and John Does. Humberto Munoz was arrested on January 12, 1996 and mistakenly identified by Idania Arias as one of the kidnappers. After many months in jail, the mistake as to Humberto Munoz was determined and he was released. A superseding indictment (R.34) was filed on May 28, 1996 and named Ilvigio Hernandez, Humberto Munoz, Sergio Echevarria and Eladio Munoz. The second superseding indictment (R.57) was filed on June 18, 1996 and added as a new defendant Ismael Camacho. The third superseding indictment (R.160) was filed on April 22, 1997 and added Vlademir Negrin, Carlos Escandell, Jose Blas Lopez, Gloria Diaz and Orestes Hernandez. By the time the fourth superseding indictment (R.330) was filed on April 1, 1998, Ilvigio Hernandez and Carlos Escandell had entered pleas of guilty and, thus, were not named in the fourth superseding indictment. Vlademir Negrin was named in the indictment, but pled guilty before the trial of the six appellants began in May of 1998.

2

Munoz, Orestes Hernandez and Camacho to extort money from the family of Jose and Idania Arias by the method of kidnapping. Ilvigio was an active additional participant in the Arias kidnapping and was to become the primary witness for the government in its successful prosecution. As the law enforcement effort continued after the Arias kidnapping, the authorities learned of an earlier, unreported kidnapping of Nelson and Mercedes Martin on June 26, 1995.

The investigation of the Arias kidnapping eventually led to the arrest of Echevarria and Munoz. The remaining active members of the kidnapping gang—Orestes Hernandez and Camacho—then joined with two other persons, Vlademir Negrin ("Negrin") and Carlos Escandell ("Escandell"), and engaged in a similar episode involving Rosa and Armando Gonzalez in November of 1996. After many months, arrestee Ilvigio broke his silence and became the government's primary witness as to the January 1996 Arias crime. His cooperation included the disclosure that the remaining two appellants, Diaz and her husband Lopez, had served as "tipsters" in identifying targets for robbery and extortion plots.

The testimony of Ilvigio, bolstered by the vivid descriptions of the victims Idania Arias, Jose Arias, Joseph Arias, Nelson Martin, Mercedes Gomez Martin, and Armando Gonzalez, and aided by cellular telephone records, served to corroborate the identifications and testimony of Ilvigio as to the Arias and Martin crimes. All six

3

appellants—the alleged "tipsters" Diaz and Lopez and the remaining four, Echevarria, Munoz, Orestes Hernandez, and Camacho—were tried jointly and convicted of a series of charges, which featured Hobbs Act violations.[2]

## II.    The Kidnapping Episodes

Three separate episodes underlie the charges in this case.[3]  First was the robbery and extortion of Nelson and Mercedes Gomez Martin on June 26, 1995.  The second episode included the kidnapping and extortion of Jose and Idania Arias and their children on January 11, 1996.  The final episode involved the November 4, 1996 attempted robbery of Rosa Gonzalez, Armando Gonzalez's housekeeper and the kidnapping and extortion of Armando Gonzalez on November 13, 1996.  The Arias and Gonzalez episodes also involved carjacking, and firearms were used in all three episodes.

---

[2]Ilvigio, Vladmir Negrin, and Carlos Escandell were also indicted in the district court case. All three entered pleas of guilty and have been sentenced.  Ilvigio received a sentence of 122 months, Negrin a sentence of 390 months, and Escandell a sentence of 71 months.  Escandell, like Ilvigio, testified as a government witness and described his participation along with Negrin, Orestes Hernandez, and Ismael Camacho in the Gonzalez episode in November of 1996.

[3]A detailed description of each incident is provided *infra* Parts II.A, B & C.

Although not physically involved in the robberies and extortions, Lopez and Diaz served as "tipsters."[4] They were Santeria priests and used their positions to gain confidential information regarding the financial status of their followers, called "godchildren."[5]  This information was then passed on to Orestes Hernandez who in turn, along with Echevarria, Camacho, Munoz, and Ilvigio, targeted the individuals beginning in December 1994.  Both the Martins and the Ariases were godchildren of Lopez and Diaz.

---

[4]Neither Lopez nor Diaz was implicated in the Gonzalez episode that took place in November of 1996.  Rather, Escandell, a cooperating defendant in the Gonzalez episode, identified an anonymous mechanic as the "tipster" for those crimes.

[5]Santeria is a syncretistic religion of Caribbean origin in that it represents a compromise of conflicting religious beliefs.  Its origins date back to the slave trade when African natives were forcibly transported to the Caribbean.  The religion is currently concentrated in Cuba and other Caribbean islands, and among Hispanics in Florida, New York City, and Los Angeles.  Ritual sacrifices form an integral part of many Santerian religious rituals.  Very little is known about the beliefs, rituals, symbolism, and practices of the Santerian religion.  Like most Aboriginal religions, it is preserved by an oral tradition.  There are priests and priestesses who are trained for many years in the oral tradition of the faith.  This is followed by a period of solitude before being initiated.  They learn dance, songs, and healing methods.  Their followers or clients are called "godchildren." *See* http://www.seanet.com/~efunmoyiwa/ochanetold.html (last visited February 20, 2001).

## A.    The Nelson and Mercedes Martin Episode

Munoz, Echevarria, Orestes Hernandez, and Camacho kidnapped Nelson Martin on June 26, 1995.  Munoz owned and drove the car used to kidnap Nelson, while Echevarria was one of two or three men who pulled Martin from his car.

Nelson Martin and his wife Mercedes Gomez Martin owned Rosa Medical Center and Family Assistance Network.  (R.378, at 1005 & 1008).  Nelson Martin had gone to the mall to get his hair cut when, upon returning to his car, he was approached by two or three men who were wearing badges, carrying guns, and screaming "FBI, FBI."  (R.370, at 853–54).  Martin was dragged from his car at gunpoint and thrown in the back of a green Cadillac where duct tape was wrapped around his eyes, mouth, head, hands, and ankles.  (*Id.*).

When they got Martin in the car, Munoz punched Martin in the face twice and told him that he had "a lot of fucking problem with [him], that he had been after [him] for a long time." (R.370, at 856–57).  The kidnappers took Martin's watch and money while driving for about half an hour.  (R.370, at 868–69).  Although Martin's eyes were taped, his profuse sweating had created a little space from which he could see. (R.370, at 867).  Upon arriving at their destination, the kidnappers carried Martin up a flight of stairs and threw him on a bed.  (R.370, at 869–70).  Martin was unable to walk because his feet were still bound.  (R.370, at 869).  A few minutes later, Martin

6

heard a blow torch being ignited and then felt the heat and was burned on his face, ears, and scalp. (R.370, at 870). The kidnappers continued to beat Martin even while he was being burned and demanded to know the whereabouts of his money. (R.370, at 871). After about five minutes, the kidnappers took the tape off his mouth, and Martin lied to them and told them he had money in his wife's closet at his house so they would stop torturing him. (R.370, at 871–72).

After obtaining Martin's alarm code and keys to his house, three of the kidnappers went to Martin's house and ransacked it looking for the money. (R.370, at 873). They stole everything from his closet but did not find any money. Upon their return, Martin was hit for lying. (*Id.*). While this was going on, Martin's wife, Mercedes Gomez Martin, and daughter arrived at home. Upon seeing the ransacked house, Mercedes began to page her husband. (R.378, at 991–92). The kidnappers returned her page sometime later, and they demanded $75,000 in return for her husband. (R.378, at 993). The kidnappers mentioned that Mercedes had a clinic, told her they knew about her businesses, and stated that this was their "job." (R.378, at 996). They threatened Mercedes to keep her from going to the police, saying her daughter would be next if she did, and it would be worse.

Mercedes worked over the next sixteen hours to come up with $75,000. Martin was moved several times during this period of time. Mercedes was given a drop-off

site the next day, which the kidnappers moved several times. (R.378, at 996–98). While Mercedes waited in the empty lot to drop off the money as instructed, a green Cadillac appeared. Echevarria, Camacho, and Martin got out of the back. Mercedes later identified Echevarria as the person to whom she gave the money. (R.378, at 1020–21). She also identified Camacho as the person "fiddling with the trunk" of the green Cadillac. (R.378, at 1021–22). The Martins did not report the kidnapping and extortion to the police for fear of their children's lives. (R.370, at 877). They did, however, report the stolen car and guns. (R.370, at 878).

During the two years prior to the kidnapping, Mercedes Gomez Martin had been visiting Gloria Diaz. (R.378, at 1011). This relationship continued up until about a month or a month and a half before the kidnapping when Mrs. Martin and Diaz had a falling out over the presence of an old girlfriend of Nelson Martin's at Diaz's home. (R.378, at 1016–17). During their relationship, however, Mrs. Martin advised Diaz about her multiple businesses, including her health care businesses and health care clinics. Diaz then passed this information on to Orestes Hernandez and instructed him to rob Mrs. Martin. (R.382, at 1235–39).

## B. The Jose and Idania Arias Episode

Idania Arias also was a client/follower of Diaz and Lopez. In October 1995, Idania Arias met Diaz for the first time. Beginning with their first meeting, at which Diaz was going to read Idania Arias's tarot cards, Diaz made reference to her financial status and her businesses. (R.392, at 1765–66). As their relationship progressed, Idania Arias told Diaz about her medical supply business, her billing service, and the medical center. (R.392, at 1766). In December 1995, Diaz again read Idania Arias's tarot cards and said that Arias's house needed a "cleansing." (R.392, at 1769). Lopez and Diaz then went to the Arias home, sacrificed a rooster and a hen, and then spread herbs in the rooms to cleanse them of evil spirits. (R.392, at 1770). During this cleansing, Lopez and Diaz commented on how nice Idania Arias's house was and that she must be making very good money. (R.382, at 1251–52; R.392, at 1770). Idania Arias was questioned as to the location of her valuables, to which she responded they were everywhere. (R.382, at 1251–52).

Diaz then passed this information on to Orestes Hernandez who shared the information with Munoz. (R.378, at 1180–81). On January 11, 1996, Munoz, Echevarria, Orestes Hernandez, and Ilvigio began stalking the Arias family again. (R.382, at 1248–49). They called Diaz to try and locate Idania Arias. (*See* GX:216 A–C). After calling Idania Arias's billing service business and going to her clinic,

9

they finally located her after going to her home where they observed her leaving with her four-year-old son Anthony. (R.382, at 1254–55). They followed her to the library, where she picked up her eight-year-old son Joseph, and then back to her house. As she pulled into her driveway, Echevarria's white Jaguar pulled up behind her. (R.382, at 1255). Echevarria, Ilvigio, Orestes Hernandez, and Munoz got out and approached her with guns drawn. (R.388, at 1671). Idania Arias handed them her keys and told them to take what they wanted to which they responded that they wanted her and her children. Idania Arias and her two children were forced into the white Jaguar. (R.388, at 1672). Munoz stayed behind in order to steal Idania Arias's black Lexus. (R.382, at 1255).

Idania Arias's eyes, hands, and ankles were duct taped. Duct tape was also placed on the eight-year-old Joseph. Echevarria, who was driving, took them to International Alignment—a paint and body shop. (R.382, at 1260–61; R.388, at 1678; R.392, at 1895). When they got there, they drove inside to wait for Munoz. Idania Arias continually asked why she was being kidnapped, but they did not answer and told her to quit asking questions. She was told that "El Negro" (Munoz) would tell her why she was there when he arrived. (R.382, at 1261–62).

The kidnappers asked about Mr. Arias's whereabouts. (R.388, at 1682). According to Idania Arias, the kidnappers appeared to know everything about her

10

clinic, her billing company, and her medical supply business. (*Id.*). After about forty-five minutes, there was another cellular telephone call from Orestes Hernandez's telephone to Lopez and Diaz's home telephone. (GX:216 A–C). Ilvigio then beeped Camacho. When Camacho returned the call, he was instructed to come to the shop because they had some kidnapping victims. (R.382, at 1262).

Cellular telephone records from the time period when the Arias family was in the body shop revealed the multiple telephone calls and also revealed that the kidnappers tried to reach Mr. Arias at the medical clinic. (GX:216 A–C). The men forced Idania Arias to call her husband and tell him that she and the children had been kidnapped, and if he ever wanted to see them alive, he would have to meet the kidnappers at the clinic with $500,000. (R.388, at 1683–84). Jose Arias was warned not to call the police. (*Id.*). The kidnappers intended on also seizing Jose Arias to insure that he did not go to the police. (R.382, at 1268). On his way to the clinic, however, Jose Arias called the police and never made it to the clinic. (R.402, at 1999).

The kidnappers returned from the clinic empty-handed. Munoz told Idania Arias they wanted $500,000 ransom. (R.388, at 1688). They explained to her that this was "their job" and that usually they burn, torture, and shock their victims. (R.388, at 1680, 1688–89). Idania Arias was hit, and the kidnappers threatened to kill her

11

children if she did not raise the money. Idania Arias then was released to raise the ransom.

The children were kept at the warehouse over night and then were taken to the Jamaica Inn around 5:00 a.m. the next morning. Ilvigio rented a room at the motel, and he and Munoz took the children there to wait for the ransom. (R.382, at 1274.1280). Ilvigio kept Idania Arias's beeper so she could maintain contact with him regarding her progress in raising the $500,000. (R.388, at 1690–91).

Following her release, Idania Arias went to her parents' home where she was met by the Metro Dade Police. (R.388, at 1698–99). Upon meeting them, she was so terrorized that she did not believe they were really police officers. (R.388, at 1699). After she accepted that her husband had contacted the police, she cooperated and went to the police station where an undercover telephone was set up for Idania Arias to phone the kidnappers. (R.388, at 1699–1701). Idania Arias would page her beeper and Ilvigio would call her back immediately. The cellular telephone records for January 11 and 12, 1996 reflect multiple calls between Orestes Hernandez's cellular telephone, Ilvigio's cellular telephone, and the undercover telephone. (R.388, at 1703–04).

Following the advice of the police, Idania Arias told the kidnappers that she could raise only $250,000. (*Id.*). Ilvigio and Munoz agreed to accept this amount, and

Idania Arias arranged for a controlled delivery to the kidnappers of a package purporting to be the ransom money. (R.382, at 1274; R.388, at 1704–05). The drop-off site was changed a number of times until the kidnappers finally decided on the cemetery, where Idania Arias was told to drop the money behind a white and red car. (R.388, at 1705–08). Both Ilvigio and Idania Arias testified that, while driving to the drop off site, Idania demanded to know the location of her children. (R.382, at 1290; R.388, at 1708–09). Ilvigio informed her that they were in Room 43 at the Jamaica Inn. (R.382, at 1290).

Ilvigio, Munoz, Echevarria, Orestes Hernandez, and Camacho waited in two separate vehicles parked across the street from the cemetery. (R.382, at 1288–89). The men saw Arias approach the area as instructed and drop the purported money behind the white and red car. (R.382, at 1289). However, at that point they also saw the police converge upon the occupant of the car, Humberto Munoz (no relation to Eladio Munoz). (*Id.*). Realizing that Idania Arias had gone to the authorities, the kidnappers left the area.

Later, Munoz drove Ilvigio home where, approximately five minutes after Ilvigio arrived, he was arrested. (R.382, at 1291). When Ilvigio was arrested, he still had Arias's beeper in his possession as well as the cellular phone used during the ransom negotiations. (R.402, at 2061–69). After Ilvigio confirmed to the police that

13

the kids were in the Jamaica Inn, the children were safely recovered. (R.402, at 2066–67).

Following the arrest of Ilvigio, the FBI spent weeks examining telephone records from Ilvigio's cellular phone. (R.403, at 2284). They discovered that Ilvigio, Echevarria, Orestes Hernandez, Munoz, and Camacho were communicating constantly with each other during the period of time spanning Idania Arias's kidnapping. (GX:216 A–C). For each one of the suspects, investigating agents created a photo spread of six people to show Idania Arias and her oldest son, Joseph. (22:2298). Idania Arias ultimately identified Echevarria, Munoz, and Camacho. (R.392, at 1747, 1748, 1750–51). Joseph Arias identified Munoz and Camacho. While Ilvigio was arrested immediately, he was the only kidnapper in custody until late May 1996 when Munoz and Echevarria were arrested. Although he initially denied the charges, Ilvigio later decided to cooperate with the government.

Idania Arias later told Diaz and Lopez about the kidnapping and extortion. (R.392, at 1771–73). Diaz's reaction was strange according to Idania Arias. Instead of crying with Arias, like most people who heard the story, Diaz kept asking if the kidnappers got any money. (R.392, at 1771). Diaz told Arias not to worry about the incident because many people who came to their home were invaded and kidnapped. (R.402, at 1945–46). Arias explained that "they," presumably referring to Diaz and

Lopez, questioned her about the arrests and investigation in the case. (R.392, at 1771–74).

Approximately five months after the first kidnapping, on June 15, 1995, a second home invasion of Jose and Idania Arias took place. (R.392, at 1796). Jose and Idania Arias described an entry of four Latin males into their home by climbing over a locked gate on the west side of the house. The entire Arias family, including the children, were in the kitchen having pizza. The masked men armed with guns confronted them. (R.402, at 2001). They said to Jose that they "finally caught him." (*Id.*).

The men separated Jose Arias from his wife and sons. (*Id.*). The men demanded to know where the safe was located in the residence and threatened to kill the victims if they did not reveal the location. (R.392, at 1797). The kidnappers stated that the Ariases owned a medical supply company and there must be a safe. (R.392, at 1798). When the Ariases replied that there was no safe, the men began moving furniture, pictures, and other articles looking for one. (*Id.*). Finally, when they could not find money, the men directed Joseph Arias to go with his father to the bedroom. (R.392, at 1797). As they grabbed Joseph, one man stated, "Give me the older one because he's the one who's talking and identifying people." (*Id.*).

Idania and Anthony Arias were held at gunpoint in the Florida room and were told that Jose Arias was being killed. (R.392, at 1800; R.402, at 2001). Jose and Joseph Arias were in the back bedroom where one of the men threatened to kill the child. (R.402, at 2004–05). Jose Arias was told that his wife was being raped by the kidnappers in the Florida room. (R.402, at 2006).

Jose Arias was beaten with the butt of a gun, handcuffed, and tied at his ankles and knees. (R.402, at 2002). The men tied an electrical cord around Joseph's neck saying that they were going to kill him. (R.402, at 2004–05). They then took the electrical cord they had tied around Joseph's neck and hung him from a ceiling fan in the bedroom. Joseph Arias was placed on his father's shoulders underneath the ceiling fan, in an apparent attempt to get Jose Arias to reveal the location of the safe. (*Id.*). Jose Arias could not move because Joseph would fall and hang. (*Id.*). At one point, the men actually shoved Jose down so that Joseph hung but did not strangle. While Joseph was standing on his father's shoulders, he overheard one of the invaders say, "Gloria said not to kill them, just hurt them because then we can get more money out of the family." (R.402, at 2103).[6]

---

[6]The Court notes that the impact of this statement arguably was lessened by defense counsel's questioning of Joseph Arias whereby Joseph admitted that he first remembered this statement a few weeks before trial. (R.402, at 2120–21).

At some point during the robbery, Idania managed to flee with Anthony to a neighbor's house where the police were contacted. (R.392, at 1800–01). The men fled before the police arrived. The circumstantial evidence suggested that two of the men involved in this home invasion were Camacho and Orestes Hernandez.[7] When Idania told Gloria Diaz about this second home invasion, Gloria again responded, "Did they steal a lot of money?" (R.392, at 1802).

## C.    The Gonzalez Episode

The final target was Armando Gonzalez who, along with his wife from whom he was separated, owned a gas station and a day care in Miami. (R.427, at 2632). Orestes Hernandez apparently received a "tip" from a "mechanic" who knew Armando Gonzalez and said that he would have a lot of money in a safe in his house. (R.428, at 2802–05, 2868–69, & 2872). Echevarria and Munoz had been arrested following the Arias kidnapping; therefore, Orestes Hernandez and Camacho recruited Vlademir Negrin to join their gang.

Orestes Hernandez, Camacho, and Negrin initially targeted Gonzalez on November 4, 1996, but he was not home—only his housekeeper, Rosa Gonzalez was

---

[7]Ilvigio and Munoz had already been incarcerated and the kidnappers made multiple references to the prior kidnapping of Idania and the children and referred to Gloria Diaz within earshot of Joseph Arias.

17

home.[8] (R.427, at 2599–2600). When Rosa answered the door, Camacho said he had a package for Armando. (R.427, at 2600). Camacho then produced a handgun, pointed it at Rosa, and ordered her into the living room. (R.427, at 2602). Camacho and Negrin went inside the house. Negrin also produced a handgun and pointed it at Rosa Gonzalez. Again, duct tape was used to bind her hands. (*Id.*).

Camacho questioned Rosa Gonzalez about the location of the safe. (R.427, at 2603). Rosa denied having any knowledge of a safe, but the men ransacked the house searching for its location. (R.427, at 2603–04). Unsuccessful in locating a safe, the men fled and instructed Rosa not to call the authorities for ten minutes. (R.427, at 2604). Rosa Gonzalez was able to identify Camacho in a composite lineup.[9] (R.427, at 2606–07).

Negrin, Orestes Hernandez, and Camacho then decided to kidnap Armando Gonzalez and recruited a friend of Vlademir Negrin, Carlos Escandell, to help. (R.428, at 2798–2800). About nine days after the episode involving Rosa Gonzalez, the four men set out to abduct Armando. They conducted surveillance on Gonzalez and received information from the "mechanic." (R.428, at 2807–12).

_____

[8]Rosa Gonzalez was of no relation to Armando Gonzalez.

[9]Only Camacho and Orestes Hernandez were charged with the November 4th crimes in Counts VII and VIII of the fourth superseding indictment.

18

At approximately 6:00 a.m. on November 13, 1996, Armando Gonzalez exited his girlfriend's house and got in his Dodge Ram truck. (R.427, at 2634; R.428, at 2812). Gonzalez was stopped immediately by a white Caprice Chevrolet with flashing blue lights, which he believed to be a police car. Behind the "police car" was a Ford Explorer leased by Orestes Hernandez. (R.427, at 2634–35; R.428, at 2813). Gonzalez pulled his vehicle over and saw several men dressed as police officers jump out of the white Chevrolet. (R.427, at 2634–35). The "police officers" were later identified as Escandell, Camacho, Orestes Hernandez, and Negrin. (R.428, at 2812). The men approached Gonzalez's car with guns drawn and told him he was under arrest. (R.427, at 2634). Gonzalez was removed from his vehicle, handcuffed, duct-taped, and thrown into the back seat of the Caprice. (R.427, at 2635). Armando Gonzalez was blindfolded with duct tape so he could not see. Negrin took Gonzalez's truck, and Orestes Hernandez drove behind in his own vehicle. (R.428, at 2814). The kidnappers stole Gonzalez's wallet, cash, jewelry (including a gold Star of David), and watch. (R.428, at 2820–21).

Gonzalez was driven to Camacho's house where his truck was parked inside the garage. (R.428, at 2815–16, & 2818). He was severely beaten, and his pants were lowered so that the men could use a blow torch on his genitals. (R.428, at 2822). Both his buttocks and thighs were burned. Several times the men inserted the blow

19

torch in Gonzalez's rectum and lit it. (*Id.*). The kidnappers also used a stun gun on Gonzalez's arms. (*Id.*). They applied the torch to Gonzalez's eyes, actually burning the duct tape that covered them. (*Id.*).

The kidnappers demanded the alarm code to the house that Gonzalez was sharing with his girlfriend. (R.427, at 2639). Gonzalez gave the men the code, and they ransacked the house stealing jewelry, men's clothing and $30,000 in cash receipts from his gas station. (R.427, at 2639 & 2642). The kidnappers told Gonzalez many things about his family and his business, including where his girlfriend worked, that one of his sons drove a black jeep, and where his other son attended school. (R.427, at 2638; R.428, at 2820). When the men returned, they placed Gonzalez in the back of his Dodge truck and dropped him at an unknown location. (R.427, at 2642). Gonzalez was left tied in the back seat of his truck and told not to contact the police because they would be watching his family. (R.427, at 2638 & 2642). Gonzalez did not go to the police. (R.427, at 2669). Only when Escandell was arrested in connection with another kidnapping attempt did Gonzalez's kidnapping get reported by Escandell.[10]

---

[10]On December 18, 1996, Escandell was arrested in connection with a subsequent kidnapping attempt. (R.428, at 2831). Once arrested, he told the detective about everything in which he had been involved—including the Armando Gonzalez kidnapping. (*Id.*).

20

On January 10, 1997, Gonzalez was interviewed and shown a photo lineup by Detective LeFebvre. (R.427, at 2715–16). Gonzalez positively identified Negrin. (R.427, at 2716–17). Photographs of Orestes Hernandez and Camacho were not shown to Gonzalez, but Gonzalez did state that the man who did most of the talking had a stutter, and Orestes Hernandez has a stutter. (R.427, at 2637, 2717 & 2723; R.428, at 2801 & 2898). On January 11, 1997, Negrin was arrested at his home. (R.427, at 2717). He gave consent to have his apartment searched. (R.427, at 2718). Gonzalez's Star of David medal, as well as a large amount of other jewelry and walkie talkies, were found in his apartment. (R.427, at 2718–22). A stun gun was found in his car. (R.427, at 2721).

## III.  The Counts, Verdicts, and Sentences

The fourth superseding indictment did not list Ilvigio and Escandell as they had already entered guilty pleas to an earlier indictment. Count I charged all six appellants with engaging in a conspiracy from June 26, 1995 until November 18, 1996 to interfere with commerce by extortion in violation of the Hobbs Act. All six appellants were convicted on Count I.

Count II charged all appellants, except Lopez, with a substantive Hobbs Act violation in connection with Nelson Martin. The remaining five appellants were convicted on Count Two.[11]

Count III charged the four appellants—Echevarria, Munoz, Camacho and Orestes Hernandez—with a § 924(c) violation in connection with the Nelson Martin abduction. All four were convicted.

Count IV charged all six appellants with a substantive Hobbs Act violation in connection with the kidnapping and attempted extortion of Idania Arias and her two children. All six appellants were convicted.

Count V charged all six appellants with carjacking as it related to Idania Arias. Diaz and Lopez were acquitted. Appellants Echevarria, Munoz, and Orestes Hernandez were convicted.[12]

Count VI charged appellants Echevarria, Munoz, Camacho and Orestes Hernandez with a § 924(c) violation in relation to the Arias abduction and each was convicted.[13]

---

[11]The government dismissed Counts II and III as to Lopez during the Rule 29 process. *See* R.430, at 3289–90.

[12]The government moved to dismiss as to Camacho; its motion was granted. (R.430, at 3368).

[13]Lopez and Diaz were charged in Count VI, but the government dismissed as to both. *See* R.430, at 3341.

Count VII charged appellants Camacho and Orestes Hernandez with a substantive Hobbs Act violation by engaging in a robbery as it related to the home invasion of the Gonzalez house on November 4, 1996. Both were convicted.

Count VIII charged appellants Camacho and Orestes Hernandez with a § 924(c) violation as it related to the invasion of the Gonzalez home on November 4, 1996. Camacho was convicted and Orestes Hernandez was acquitted.

Count IX charged appellants Camacho and Orestes Hernandez with a substantive Hobbs Act violation as it related to the abduction of Armando Gonzalez on November 13, 1996. Both were convicted.

Count X charged appellants Camacho and Orestes Hernandez with carjacking as it related to the Dodge Ram driven by Armando Gonzalez. Both were convicted.

Count XI charged appellants Camacho and Orestes Hernandez with a § 924(c) violation as it related to the abduction and carjacking of Armando Gonzalez. Both were convicted.

Echevarria was sentenced to a total of 465 months, a three-year period of supervised release, and $146,250 in restitution.[14] Munoz was sentenced to a total of

---

[14]Echevarria was sentenced to three concurrent terms of 240 months imprisonment for the Hobbs Act violations charged in Counts I, II, and IV; a consecutive term of 165 months for the carjacking violation charged in Count V; and a consecutive term of 60 months imprisonment for the single § 924(c) violation charged in Count III for a total of 465 months, plus restitution in the sum of $146,250.00.

705 months, a three-year period of supervised release, and $146,250 in restitution.[15]

Camacho was sentenced to a total of 1145 months, a three-year period of supervised release, and $192,050 in restitution.[16] Orestes Hernandez was sentenced to a total of 665 months, a three-year period of supervised release, and $45,800 in restitution.[17] Lopez was sentenced to 188 months, a three-year period of supervised release, and

---

[15]Munoz was sentenced to three concurrent terms of 240 months for the Hobbs Act violations charged in Counts I, II, and IV; a consecutive term of 165 months for the carjacking violation charged in Count V; a consecutive term of 60 months for the first § 924(c) violation charged in Count III; and a consecutive term of 240 months for the second § 924(c) violation charged in Count VI for a total of 705 months, plus restitution in the sum of $146,250.00.

[16]Camacho was sentenced to a term of 300 months for his single carjacking conviction as charged in Count X; concurrent terms of 240 months for the Hobbs Act violations as charged in Counts I, II, IV, and VII, to be served concurrently with the 300 month sentence for Count Ten; a term of 65 months for the Hobbs Act violation charged in Count IX, to be served consecutively to the sentences imposed for Counts I, II, IV, VII, and X; a term of 60 months for the first § 924(c) violation as charged in Count III, to be served consecutively to the other sentences; and, finally, an additional 720 months to be served consecutively to all other sentences for the second, third, and fourth § 924(c) violations as charged in Counts VI, VIII, and XI, for a total of 1145 months, plus restitution in the sum of $192,050.00.

[17]Orestes Hernandez was sentenced to concurrent terms of 240 months for the Hobbs Act violations charged in Counts I, II, IV, and VII; a term of 300 months for the carjacking violation charged in Count X and a term of 180 months for the carjacking violation charged in Count V, with both carjacking sentences to be served concurrently with the terms for Counts I, II, IV, and VII; a term of 65 months for the Hobbs Act violation charged in Count IX, to be served consecutively to the sentences for Counts I, II, IV, and VII; a term of 60 months for the first § 924(c) violation as charged in Count III, to be served consecutively to the other sentences, and an additional 480 months for the second and third § 924(c) violations as charged in Counts VI and XI, for a total of 905 months, plus restitution in the sum of $45,800.00.

$5,200 in restitution.[18] Finally, Diaz was sentenced to a total of 293 months, a three-year period of supervised release, and $5,200 in restitution.[19]

Appellants timely appealed their convictions and sentences. In sum, appellants challenge the following: (1) the application of the Hobbs Act and the sufficiency of the evidence as to their culpability for the Hobbs Act conspiracy and the four substantive Hobbs Act counts dealing with the kidnappings, extortion, and robberies as set forth in Counts II, IV, VII, and IX; (2) the sufficiency of the evidence as to the carjacking counts; (3) the sufficiency of the evidence as to the carrying and use of a firearm counts; (4) procedural and pretrial issues including denial of a severance, mistrial, in-court and out-of-court identifications, and enforcement of the district court's sequestration order; and (5) the sentences with respect to Echevarria, Orestes Hernandez, and Lopez. The Court will address these issues separately, paying careful attention to distinguish which appellants appeal on which grounds.

---

[18]Lopez was sentenced to 188 months imprisonment for the two Hobbs Act violations as charged in Counts I and IV, plus restitution in the sum of $5,200.00.

[19]Diaz was sentenced to concurrent terms of 293 months for the three Hobbs Act violations as charged in Counts I, II, and IV, plus restitution in the sum of $5,200.00.

**IV. Application of the Hobbs Act and Sufficiency of the Evidence as to the Conspiracy and Hobbs Act Convictions**

All six appellants, either by virtue of their own brief or adoption of the briefs of their co-appellants, challenge the sufficiency of the evidence as to their culpability for the conspiracy to violate the Hobbs Act and the four substantive Hobbs Act violations. The Court will address both the conspiracy to violate the Hobbs Act and the substantive violations as they relate to Echevarria, Munoz, Camacho, Orestes Hernandez, and Diaz collectively. Both the conspiracy conviction and the substantive Hobbs Act conviction of Jose Blas Lopez will be addressed separately as the Court finds that his role in the commission of these crimes raises issues not shared by the other co-appellants.

**A. Standard of Review and Law Applicable to all Six Appellants**

Whether sufficient evidence was presented at trial to support appellants' convictions is a question of law subject to *de novo* review. *U.S. v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990). The Court reviews the sufficiency of the evidence to determine whether a reasonable jury could have concluded that the evidence established appellants' guilt beyond a reasonable doubt. The evidence is viewed in the light most favorable to the government and all reasonable inferences and

26

credibility choices are made in the government's favor. *U.S. v. Lyons*, 53 F.3d 1198, 1200 (11th Cir. 1995); *U.S. v. Johnson*, 713 F.2d 654, 661 (11th Cir. 1983).

The Hobbs Act prohibits robbery or extortion, and attempts or conspiracies to commit robbery or extortion, that "in any way or degree obstruct[ ], delay[ ], or affect[ ] commerce or the movement of any article or commodity in commerce." *U.S. v. Kaplan*, 171 F.3d 1351, 1354 (11th Cir.) (quoting 18 U.S.C. § 1951(a)), *cert. denied*, 528 U.S. 928 (1999). To prove a Hobbs Act conspiracy under 18 U.S.C. §§ 1951(a) & (b)(1), the government must prove that: (1) two or more persons agreed to commit a robbery or extortion encompassed within the Hobbs Act; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in helping to accomplish the goal. *U.S. v. To*, 144 F.3d 737, 747–48 (11th Cir. 1998); *U.S. v. Thomas*, 8 F.3d 1552, 1556 (11th Cir. 1993). A Hobbs Act conspiracy was established in *U.S. v. Farrell*, 877 F.2d 870 (11th Cir. 1989), by proof of a potential impact on interstate commerce in an extortion-kidnapping plot. The *Farrell* court, in discussing the interstate commerce nexus, opined:

> The Hobbs Act applies to extortion wherein the perpetrator ". . . *in any way or degree* obstructs, delays or affects commerce or the movement of any article or commodity of commerce. . . ." *Only a de minimis nexus with interstate commerce is required.* Where attempted extortion or conspiracy to extort are charged, the interstate nexus may be demonstrated by evidence of potential impact on interstate commerce, or by evidence of actual, de

27

> minimis impact[.] Potential impact is measured at the time of the attempt, *i.e.*, when the extortion demand is made, based on the assumed success of the intended scheme. A sufficient potential impact exists when there is evidence of "a plan to embark upon a course of extortionate behavior likely to have the natural effect of obstructing commerce."

*Farrell*, 877 F.2d at 875 (internal citations omitted) (emphases added).

Unlike a conspiracy charged under the Hobbs Act, which only requires proof that defendants' scheme *would have* affected interstate commerce, a substantive Hobbs Act violation requires an actual effect on interstate commerce. *See Kaplan*, 171 F.3d at 1354. However, the requisite effect on interstate commerce need not be substantial—all that is required is minimal impact. *See id.* Moreover, the effect on interstate commerce is not limited to only adverse effects. *See id.* at 1357.

While the Hobbs Act usually is applied to robberies of businesses, criminal acts directed toward individuals also may violate the Hobbs Act. Robberies or extortions perpetrated upon individuals are prosecutable under the Hobbs Act when any one of the following three conditions are met: (1) the crime depletes the assets of an individual who is directly engaged in interstate commerce; (2) the crime causes the individual to deplete the assets of an entity engaged in interstate commerce; *or* (3) the number of individuals victimized or the sums involved are so large that there will be a cumulative impact on interstate commerce. *See, e.g.*, *U.S. v. Stephens*, 964 F.2d 424

28

(5th Cir. 1992); *U.S. v. DeParias*, 805 F.2d 1447 (11th Cir. 1986), *overruled on other grounds*, *U.S. v. Kaplan*, 171 F.3d 1351 (11th Cir.), *cert. denied*, 120 S.Ct. 323 (1999); *U.S. v. Farrell*, 877 F.2d 870 (11th Cir. 1989); *U.S. v. Collins*, 40 F.3d 95 (5th Cir. 1994).

## B.  Conspiracy to Violate the Hobbs Act Involving Camacho, Orestes Hernandez, Munoz, Echevarria, and Diaz

Both Diaz and Camacho appeal their convictions of conspiracy to commit Hobbs Act extortions from June 26, 1995 to November 13, 1996; Echevarria, Orestes Hernandez, and Munoz adopt their arguments pursuant to F.R. App. P. 28(i). Specifically, appellants argue there was insufficient evidence for a reasonable jury to find beyond a reasonable doubt that the appellants had any knowledge of the goal of the conspiracy or that they voluntarily joined the conspiracy. (*See* Camacho Br., at pp.17–23; Diaz Br., at pp.9–12). The Court disagrees.

The record lacks any evidence supporting a finding that these two elements were not met. The goal of the conspiracy was to extort money from individuals identified as targets through various tips. The evidence reveals that Echevarria, Camacho, Munoz, and Orestes Hernandez invested a substantial amount of time in targeting each individual victim beginning with the initial tips provided by Diaz. Diaz relayed the tips to Orestes Hernandez who, in turn, shared the information with

29

Echevarria, Camacho, and Munoz. In addition, there is no evidence that appellants did not participate voluntarily. There is no evidence that any appellant was forced to participate. Further, at no time did any appellant indicate a desire to disengage from the conspiracy.

Although mere presence is insufficient to prove membership in a conspiracy, the Court disagrees with appellants' argument that they were merely present at various times throughout the course of the conspiracy. Appellants cite *U.S. v. Thomas*, 8 F.3d 1552 (11th Cir. 1993), as support for their argument that mere presence or knowledge does not support the conclusion that they voluntarily participated in the agreement or the accomplishments of its goals. *See id.* at 1558.

The conspiracy in *Thomas* involved an alleged scheme to rob a bank and to dynamite the sheriff's office in Danielsville, Georgia. Johnny and Lisa Reese were convicted of conspiracy under the Hobbs Act. On appeal, they argued there was insufficient evidence to support their convictions. The evidence against Johnny Reese amounted to the following: Johnny Reese was in the car on March 5, 1991 when it broke down near the bank; he stood in front of the hardware store while two others entered the bank; when everyone came out of the bank, they all walked to a restaurant; Johnny Reese was present while another person disclosed the plan; and, according to one of the members of the conspiracy, he was never identified as a participant in the

30

conspiracy during any of the conversations among the conspirators. The evidence against Lisa Reese revealed the following: Lisa Reese was in the car on March 5, 1991 when it broke down; she went into the bank and requested information about opening an account, asked if the bank had a public restroom, and picked up some bank brochures; and, one member of the conspiracy testified that "the girls" made sketches of the bank and that this statement referenced Lisa Reese and another woman. In taped conversations, Lisa Reese's statements reflected her distaste for the planned bank robbery. Lisa Reese testified at trial that she did not take the plans to rob the bank seriously, and she denied making any sketches. *Thomas*, 8 F.3d at 1556–60.

Unlike the evidence in *Thomas*, the evidence regarding participation in the case before the Court is substantial. Ilvigio's testimony is rife with information regarding each appellant's role in the various kidnappings and attempted kidnappings. Ilvigio first became a part of the conspiracy through a coworker—Munoz. During a trip in December 1995 for the trucking company they worked for, Munoz and Ilvigio discussed both the kidnappings and robberies Munoz had done in the past and future "jobs." (R.378, at 1187–88). It was during this trip that Ilvigio agreed to join the conspiracy. Upon arrival back in Miami, he and Munoz planned to contact Munoz's friends in order to do a "job" together. (R.378, at 1196). Munoz's friends were Echevarria (a.k.a. Tatico) and Camacho (a.k.a. Pepe). On December 24, 1995, after

31

arriving in Miami on the 23rd, Munoz picked up Ilvigio to meet with Camacho. (R.378, at 1197). Camacho, Munoz, and Ilvigio went to Echevarria's home where they discussed the robberies and kidnappings. They then met up with Orestes Hernandez (a.k.a. Orestico or El Gago). (R.382, at 1223).

Ilvigio's involvement began with the attempted robberies and kidnappings of four individuals. They targeted individuals by the name of Tony, Alex, Orestes, and an unnamed woman. These incidents occurred toward the end of 1995 and the beginning of 1996. Two of these individuals—Tony and Orestes—previously had been robbed by Munoz, Orestes Hernandez, Echevarria, and Camacho.[20] (R.382, at 1230–31). It was during this same period of time that Mercedes Gomez Martin was targeted for the second time.

The evidence presented at trial revealed that Diaz provided tips to Orestes Hernandez regarding both the Martins and the Ariases. (R.378, at 1180–81; R.382, at 1235–36, 1239–40). In return, Diaz received a good sum of money. (R.382, at 1239). In addition, on January 11, 1996 when Mercedes Gomez Martin was targeted,

---

[20]In Echevarria's factual analysis of matters at issue, he discusses the government's use of evidence of the uncharged misconduct through Ilvigio's testimony. Echevarria argues that this evidence constituted extrinsic evidence, and its use was impermissible. Relying on *U.S. v. Martin*, 794 F.2d 1531 (11th Cir. 1986), the court determined that the evidence was intrinsic—not extrinsic. Accordingly, the court stated that no limiting instruction was necessary. *See* R.382, at 1212–16; R.388, at 1666. Assuming, *arguendo*, that the evidence was extrinsic and no limiting instruction was given, such error was harmless in light of the overwhelming evidence against Echevarria.

Orestes Hernandez, Echevarria, Munoz, and Ilvigio went to see Diaz at her house to get addresses for Mrs. Martin. (R.382, at 1244). Finally, Ilvigio was able to identify Diaz in court. (R.382, at 1247).

Although Ilvigio did not participate in the original robbery and extortion of the Martins, he was an active member of the conspiracy along with Orestes Hernandez, Munoz, Echevarria, and Camacho, when Mercedes Gomez Martin was targeted the second time on January 11, 1996. They used Camacho's car and, while in the car, Camacho discussed mistakes made during the prior kidnapping of Nelson Martin back in June of 1995. (R.382, at 1237).

Diaz argues on appeal that there was no evidence supporting the jury's finding that she voluntarily participated in the conspiracy because the only evidence against her came from Ilvigio's testimony, which appellants claim constituted double hearsay. The Court disagrees. Ilvigio's testimony regarding the four unsuccessful surveillances, the second attempt involving Mercedes Gomez Martin, and the statements made by individual members of the conspiracy was not hearsay. Pursuant to Fed. R. Evid. 801(d)(2)(E), statements of coconspirators of a party made during the course and in furtherance of the conspiracy are, by definition, not hearsay.[21] The

---

[21]Fed.R.Evid. 801(d)(2)(E) provides:
> A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. The contents of the statement shall be

district court determined that a conspiracy existed and that these statements were made in furtherance of that conspiracy.[22]  (R.428, at 3369).  Accordingly, Ilvigio was not precluded from testifying about what a coconspirator told him regarding a conversation with another coconspirator.  *See U.S. v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999) (citing *U.S. v. Gironda*, 758 F.2d 1201, 1216–19 (7th Cir. 1985)).

In sum, contrary to appellants' arguments, a reasonable jury could find beyond a reasonable doubt that the appellants knew of the conspiratorial goal and that they participated voluntarily.  Accordingly, appellants' convictions for conspiracy to commit Hobbs Act extortions are affirmed.

**C.    Substantive Violations of the Hobbs Act Involving Camacho, Orestes Hernandez, Munoz, Echevarria, and Diaz**

---

considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

[22]The court must be satisfied that there was a conspiracy involving the declarant and the nonoffering party and that the statement was made in furtherance of the conspiracy.  The Supreme Court in *Bourjaily v. U.S.*, 483 U.S. 171 (1987), made three relevant holdings:  (1) when the preliminary facts relevant to Rule 801(d)(2)(E) are in dispute, the offering party must prove them by a preponderance of the evidence; (2)  when making this preliminary factual determination under Rule 801(d)(2)(E), the court may examine the hearsay statements sought to be admitted; and, (3) the Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E).  *Id.* at 176, 181, & 183.

Appellants argue that the government failed to adduce sufficient evidence to show that the kidnappings, extortions, and robberies affected interstate commerce, and, as a result, their Hobbs Act convictions must be reversed.[23] The main argument advanced by appellants is that the robberies were of three individuals—not businesses. Accordingly, they argue that the requisite effect upon interstate commerce was not demonstrated. Whether or not the extortions and robberies affected interstate commerce requires an individual analysis of the three episodes.

## 1. The Martin Episode

To find a substantive Hobbs Act violation with regard to the kidnapping and extortion of Nelson and Mercedes Gomez Martin, the Court must find that an extortion occurred and that there was an effect on interstate commerce. Appellants do not dispute that an extortion occurred. Rather, they argue that the extortion of the Martins had no effect on interstate commerce. The Court disagrees.

At the time of the extortion, the Martins owned Rosa Medical Center (R.378, at 1005). The Martins were licensed to run the center, which was a corporation designed to address the general medicine needs of its patients. Rosa Medical Center

---

[23]A finding that the requisite nexus to interstate commerce was lacking would require a reversal of the conviction for Hobbs Act conspiracy. However, because the substantive charges cover the same episodes as the conspiracy charge, a separate discussion of the interstate nexus for the conspiracy charge is not warranted.

had physicians on staff who cared for private patients. Following service of treatment, the Martins would bill private insurance companies located out-of-state for payment.[24] The insurance companies would pay the Martins who, in turn, would pay the physicians.

According to Mrs. Martin, the physicians of Rosa Medical Center had on hand various equipment to treat their patients. Specifically, Rosa Medical Center had equipment for electrocardiograms, ultrasound, and physical therapy. (R.378, at 1006). Mrs. Martin testified that she purchased all of the equipment and that some of the equipment was purchased from outside the state of Florida. (R.378, at 1007). As a result of the extortion, the Martins were forced to close the clinic for several days. (R.378, at 1112–13). As a result, seven to ten patients could not be seen, which was unusual. (R.378, at 1114). In addition, billings decreased and less work was accomplished. (R.378, at 1117).

Although the Martins were not directly engaged in interstate commerce, Mr. Martin was the president and Mrs. Martin was the administrator of a corporation, Rosa Medical Center, which was directly engaged in interstate commerce. Moreover, the extortion of the Martins resulted in an actual effect on interstate commerce in that the center was shut down for several days, during which time no patients were seen,

---

[24]These companies included, *inter alia*, Aetna, Ladd Corp., and Unisys.

resulting in no billing to or payment from the out-of-state insurance companies. The inability to see patients, which would generate income for Rosa Medical Center, establishes that the extortion of the Martins (individuals) caused them to deplete the assets of an entity engaged in interstate commerce.[25] Although Rosa Medical Center was only closed for several days, the Court concludes that such closing is sufficient to satisfy the jurisdictional requirement for a Hobbs Act violation given that the effect on interstate commerce need only be minimal so long as it is actual.

The Court cautions that its decision should not be interpreted to mean that any extortion of an individual who is an officer of a corporation that results in the closing of the corporation will be sufficient to establish a substantive Hobbs Act violation. Even proof that the corporation was directly engaged in interstate commerce, like Rosa Medical Center, is not enough on its own. What sets this case apart is the fact that the role of the Martins with regard to their business, which was directly engaged in interstate commerce, was not coincidental. Rather, the Court is convinced by the evidence presented at trial that appellants targeted the Martins *because of* their interest in Rosa Medical Center.

---

[25]The Court notes that, in reaching this conclusion, it is guided by the definition of "deplete" in Webster's Third International Dictionary, which defines the term as follows: "to empty (as the blood vessels) of a principle substance . . . to lessen in number, quantity, significant content, or force in vital power or value as a result of such lessening . . . ." Webster's Third Int'l Dict. 605 (1981).

In reaching this conclusion, the Court notes that this case is distinguishable from *U.S. v. Collins*, 40 F.3d 95 (5th Cir. 1994), which, although not controlling, is relied upon by appellants for the proposition that the extortion of the Martins amounted to the extortion of individuals with only a speculative, indirect nexus to interstate commerce. The defendant in *Collins* robbed an individual at gunpoint in the victim's home. Items taken by the defendant included cash, jewelry, clothes, and a Mercedes-Benz with its cellular phone. The defendant was convicted of a substantive Hobbs Act violation in connection with this robbery and appealed arguing that the evidence was insufficient to support a finding that the robbery obstructed interstate commerce. *U.S. v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994).

The government in *Collins* argued that the victim, an employee of a national computer company, was prevented from attending a business meeting and from making business calls on his cellular phone as a result of the robbery.[26] On appeal, the court found no actual direct affect on a business caused by the robbery of the individual employee. The victim's linkage to his business, which was directly engaged in interstate commerce, was much too indirect to present a sufficient nexus to interstate commerce to justify federal jurisdiction. *Id.* at 100.

---

[26]Alternatively, the government contended that because the stolen vehicle had traveled in interstate commerce, its theft somehow affected it. However this argument was never seriously addressed.

Whereas the robbery of the individual in *Collins* caused only a speculative, indirect effect on a business engaged in interstate commerce, the extortion of the Martins caused an actual, direct effect on a business engaged in interstate commerce. This, coupled with the fact that appellants directly targeted the Martin because of their business, establishes the requisite nexus to interstate commerce. Accordingly, the Court finds there was sufficient evidence for a reasonable jury to conclude that the evidence established appellants' guilt beyond a reasonable doubt.

### 2. The Arias Episode

The substantive Hobbs Act violation with regard to the Ariases occurred as a result of appellants' attempted extortion of $250,000. The fact that no money actually changed hands is immaterial because the Hobbs Act also proscribes an attempt to interfere or affect commerce by extortion. *See* 18 U.S.C. § 1951(a). Accordingly, to prove a Hobbs Act violation with regard to the Ariases, the Court must find that the attempted extortion would have depleted the assets of the Ariases, assuming they are directly engaged in interstate commerce, or caused the Ariases to divert assets that would otherwise be expended in interstate commerce.

At the time of the kidnapping and attempted extortion, the Ariases owned three businesses—Arias Medical Equipment, J&A Electronic Billing Services, and First

Option Medical Center. Arias Medical Equipment was a provider of medical services to people who were sick at home. It sold and rented medical supplies including, *inter alia*, walkers, canes, bathing devices, bandages, and hospital beds—some of which were purchased from out-of-state or out-of-country. J&A Electronic Billing Services provided electronic billing for clinics and doctors. Equipment used in this business included computers, printers, and telephones. All of the computers and printers were manufactured out-of-country. Finally, First Option Medical Center was a clinic that utilized medical equipment, some of which, was made out-of-country. The clinic received payments both from private national insurance companies located outside of Florida and from Medicare and Medicaid.

Compared to the Martins' businesses, the nexus between the Ariases' businesses and interstate commerce is much more substantial. A significant amount of equipment used in the billing services business and the medical supplies business was purchased or manufactured outside of Florida. In addition, the clinic received payments from private insurance companies and the federal government that originated outside the state of Florida. Given this strong connection to interstate commerce, the Court finds that the Ariases were directly engaged in interstate commerce. As a result, to uphold the Hobbs Act convictions, the Court must find that the attempted extortion would have depleted the Ariases' assets.

Appellants argue that there was no testimony that payment of $250,000 would deplete the assets of the Ariases. This argument relies on a definition of "deplete" that is limited to "eliminate." The Court's interpretation of "deplete," however, is not so narrow. According to Webster's Third New International Dictionary, the definition of "deplete" encompasses appellants' definition of "to eliminate or exhaust," but also includes "to lessen in number, quantity, content, or force or in vital power or value as a result of such lessening." Webster's Third New International Dictionary 605 (1981). Based on this definition of deplete, a payment of $250,000 would serve to deplete or lessen in number the Ariases' assets. Accordingly, the Court finds there was sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that appellants violated the Hobbs Act in attempting to extort $250,000 from the Ariases.

### 3. The Gonzalez Episode

Camacho and Orestes Hernandez were convicted on Count VII for Hobbs Act attempted robbery of Rosa Gonzalez on November 4, 1996 and on Count IX for extortion of Armando Gonzalez on November 13, 1996.[27] The crime that occurred on November 4, 1996 was attempted robbery because no money was received. Camacho

---

[27]Although Negrin was indicted on Counts VII and IX, he pled guilty before the trial for appellants began.

41

and Orestes Hernandez argue on appeal that there was no Hobbs Act attempted robbery of Rosa Gonzalez because there was no evidence that interstate commerce was potentially affected and appellants never demanded money. With regard to the extortion of Armando Gonzalez, they argue that there was no effect on interstate commerce.

The evidence produced at trial indicated that Camacho and Negrin made their way into the Gonzalez house armed with guns. Although they did not demand money, they did question Rosa Gonzalez about the location of the safe. (R.427, at 2603). After she denied any knowledge of a safe, Camacho and Negrin ransacked the house searching for one. (R.427, at 2603–04). It follows logically that they were searching for the safe to get to the money. Regardless, the Hobbs Act applies to extortion of property in general; therefore, it is immaterial that no money was demanded because the safe constitutes property. Accordingly, Camacho's and Orestes Hernandez's convictions will be upheld so long as there was a potential effect on interstate commerce.

The money appellants were after was not the money of Rosa Gonzalez. Rather, appellants sought the location of Armando Gonzalez's safe. Determining whether there was an effect on interstate commerce requires an examination of Armando Gonzalez and his businesses and their nexus, if any, to interstate commerce. This

42

analysis also applies to determine whether the extortion of Armando Gonzalez on November 13, 1996 constituted a Hobbs Act violation. Accordingly, the Court will examine the remaining two counts together.

The evidence at trial revealed that Armando Gonzalez was part owner of West Star Oil—a gas station with a convenience store. Both the gasoline used at the station and the grocery items sold at the convenience store were shipped from out-of-state. (R.427, at 2644–45). In addition, Gonzalez and his wife owned Dolphin Day Care, which purchased many of its supplies from out-of-state (R.427, at 2647). Appellants originally demanded $250,000 from Gonzalez. However, after raiding his girlfriend's house, they recovered only $30,000 in receipts from West Star Oil.

Like the Ariases, Gonzalez's business made regular and systematic purchases from out-of-state thereby establishing a greater connection to interstate commerce. The Court finds that a reasonable jury could conclude that, as part owner of West Star Oil, Gonzalez was directly engaged in interstate commerce through his business. The fact that Gonzalez was not sole owner is immaterial. Accordingly, to find a Hobbs Act violation, the Court must conclude that the attempted robbery on November 4, 1996 would have depleted, and that the extortion on November 13, 1996 did deplete, Armando Gonzalez's assets. The broad definition of "deplete" discussed previously with regard to the Ariases, again, supports this finding.

Based on appellants' original demand after kidnapping Gonzalez, they were seeking $250,000 in ransom. It is unquestionable that this amount would lessen in quantity or number Gonzalez's assets. Moreover, because there was no testimony that appellants were seeking a different amount when they first ransacked Armando Gonzalez's house on November 4, 1996, the jury could infer that this was the amount appellants were searching for as they ransacked the house looking for the safe.

Although appellants originally demanded $250,000 for Gonzalez's release, they ultimately settled on $30,000 in garage receipts, which they stole from Gonzalez's girlfriend's house. This provides an additional effect on interstate commerce. Even if there was insufficient evidence for a jury to conclude that Gonzalez was directly involved in interstate commerce, the extortion of $30,000 in garage receipts constitutes a diversion of assets of a business engaged in interstate commerce.

Finally, Camacho and Orestes Hernandez appeal on individual grounds. First, Camacho challenges his Hobbs Act conviction for attempted robbery on November 4, 1996 based on the lack of an identification at trial. Although Rosa Gonzalez was able to identify Camacho in a composite lineup, she was unable to identify him at trial. This failure, however, does not result in insufficient evidence because it does not negate the remaining evidence against him. The failed attempt to identify Camacho was made in the jury's presence, and the jury was able to consider this when

44

determining Camacho's guilt or innocence. Regardless, the government's case did not rely solely on the identification of Camacho by Rosa Gonzalez. At trial, Escandell testified about the attempted extortion involving Rosa Gonzalez because Camacho, Negrin, and Orestes Hernandez carried on conversations regarding the failure of the extortion in the presence of Escandell after he had joined the conspiracy. (R.428, at 2804–06).

Second, Orestes Hernandez argues that the government failed to prove that he participated in the extortion of Armando Gonzalez. The Court disagrees. Based on the testimony of Escandell and Armando Gonzalez, a reasonable jury could find beyond a reasonable doubt that Orestes Hernandez participated in the kidnapping and extortion of Armando Gonzalez on November 13, 1996. (R.427, at 2634–49; R.428, at 2813–28).

In conclusion, based on the foregoing, the Court finds, after a *de novo* review of the record, that there was sufficient evidence to convict appellants of the four substantive Hobbs Act extortion violations. The required nexus to interstate commerce only needs to be minimal and, in all four instances, the extortion or attempted extortion affected interstate commerce either by depleting assets of an individual directly engaged in interstate commerce or by diverting assets that would otherwise be expended in interstate commerce.

45

Accordingly, the convictions of Echevarria, Munoz, Camacho, Orestes Hernandez, and Diaz for Hobbs Act robbery and extortion of the Martins on June 25, 1995, and of the Ariases from January 11, 1996 to January 12, 1996, are upheld. The convictions of Camacho and Orestes Hernandez for Hobbs Act attempted robbery of Rosa Gonzalez on November 4, 1996, and Hobbs Act extortion of Armando Gonzalez on November 13, 1996, also are upheld.

**D.    The Sufficiency of the Evidence as to the Lopez Convictions for Conspiracy and the Hobbs Act Conviction as to the Arias Kidnapping**

Lopez's counsel moved for acquittal based on Fed. R. Crim. P. 29 as to Counts I, IV, and V.[28] The district court demonstrated a concern as to the proper ruling on the motion[29] as it is apparent from a review of the record that the prosecution's case against Lopez was less compelling than its case against the other five appellants. The district court reserved its ruling and asked for briefs. The government filed its brief on May 18, 1996 shortly before oral argument, and the district court denied Lopez's

---

[28]Fed.R.Crim.P. 29 provides the procedure for motions of acquittal whereby "the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."

[29]*See* R.430, at 3368; R.432, at 3642.

46

Rule 29 motion without any explanation.[30]  Lopez was found guilty of Counts I and IV and not guilty of Count V.[31]

Ilvigio provided the most damaging testimony against Lopez, although his association with the conspiracy was short lived as he was arrested on January 12, 1996 following the bungled Arias kidnapping. Ilvigio's knowledge of Lopez stems from his involvement in the conspiracy beginning in December of 1995.  Upon return from his and Munoz's trucking trip, Munoz introduced Ilvigio to Camacho, Echevarria and Orestes Hernandez.[32] During the process of meeting Orestes Hernandez, Ilvigio was introduced to his godfather, Jose Blas Lopez, on December 24, 1995.[33]  Ilvigio and the other active members of the gang began to engage in surveillance of potential targets for kidnapping and robbery on December 26, 1995.  The first four targets identified as Alex, Tony, a woman on Mango Hill, and a person named Orestes were the subjects of unsuccessful surveillance.[34]  Ilvigio testified that the "tipster" as to each of these

---

[30]*See* R.457, at 3693.

[31]Lopez was named in the fourth superseding indictment as to Count II (the substantive Hobbs Act count as to the June 26, 1995 Martin episode) and in Count III (the § 924(c) gun count of June 26, 1995).  The government moved to dismiss those counts at the end of its case in chief. *See supra* note 11.

[32]*See* R.382, at 1193–1222.

[33]As a part of that testimony, Ilvigio identified Lopez in open court.  *See* R.382, at 1224.

[34]*See* R.382, at 1226–34.

targets was Lopez but that the information came through Orestes Hernandez who would on several occasions place a call to Lopez to confirm locations of the targets.[35]

The government contends that Ilvigio's testimony was sufficient to connect Lopez to the conspiracy as charged in Count I. The government's case in support of Lopez's conviction on Count IV charging the Hobbs Act violation as to the Arias family relies primarily on *Pinkerton* liability. *See Pinkerton v. U.S.*, 328 U.S. 640 (1946).[36]

---

[35]*See* R.382, at 1227 (ln.18)–1228 (ln.1), 1230 (ln.10–13), & 1232 (ln.23)–1233 (ln.16).

[36]Counts I and IV charged as follows:

> From on or about June 26, 1995, to on or about November 13, 1996 . . . the defendants . . . did knowingly and unlawfully combine, conspire, confederate and agree with each other and with persons known and unknown to the Grand Jury, to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion, as the terms "commerce" and "extortion" are defined in Title 18, United States Code, Section 1951(b), in that the defendants did attempt to obtain property . . . *from individuals engaged in purchasing and selling articles and commodities in interstate commerce*, with their consent, induced by wrongful use of actual and threatened force, violence and fear; in violation of Title 18, United States Code, Section 1951.

R.330 (Count I) (emphasis added).

> On or about January 11, 1996, to on or about January 12, 1996 . . . the defendants . . . did knowingly and unlawfully attempt to obstruct and affect commerce and the movement of articles and commodities in commerce by extortion, as the terms "commerce" and "extortion" are defined in Title 18, United States Code, Section 1951(b), in that the defendant did attempt to obtain property . . . from Jose Arias and Idania Arias, owners of companies engaged in purchasing and selling articles and commodities in interstate commerce, with their consent, induced by wrongful use of actual and threatened force, violence and fear, in that the defendants kidnapped and threatened to kill Idania

48

We begin our analysis of the sufficiency of the evidence issue mindful of the instruction of *Jackson v. Virginia*, 443 U.S. 307, 322–25 (1979) that the evidence will be deemed sufficient to sustain a conviction unless we find that no rational trier of fact could have found proof of guilt beyond a reasonable doubt and further mindful of the admonition that "[m]ere knowledge of a conspiracy in association with the conspirators is insufficient evidence to support a conspiracy conviction[ ]" as enunciated in *U.S. v. Russo*, 717 F.2d 545, 549 (11th Cir.), *reh'g denied*, 720 F.2d 1294 (11th Cir. 1983). The analysis also involves the provisions of Fed. R. Evid. 801(d)(2)(E) dealing with admissibility of coconspirator statements, as well as the teachings of *U.S. v. Iacovetti*, 466 F.2d 1147, 1153 (5th Cir.1972), indicating that the uncorroborated testimony of an accomplice is sufficient to support a conviction if it is not, on its face, incredible or otherwise insubstantial.[37]

The district court found, and we agree, that the declarations of Orestes Hernandez concerning the identification of possible targets for kidnapping and extortion purposes, as set forth in Ilvigio's testimony, were made during and in

Arias and the children of Jose Arias and Idania Arias in order to obtain $500,000.00 . . . which the defendants demanded as ransom . . . .

*Id.* (Count IV).

[37]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered before October 1, 1981.

49

furtherance of the conspiracy.[38]  Thus, the declarations did not constitute hearsay.[39]

*U.S. v. To*, 144 F.3d 737, 747–48 (11th Cir. 1998) sets forth the three elements required to prove a Hobbs Act conspiracy.  The first critical element is that two or more persons agreed to commit a robbery "*encompassed within the Hobbs Act*."  *Id.* at 748 (emphasis added).  As indicated, Ilvigio described the four  surveillances of targets suggested by Lopez and conducted by Orestes Hernandez, Camacho, Munoz, Echevarria and Ilvigio during the short span of time between late December of 1995 and early January of 1996.  However, no evidence was introduced by the prosecution that would enable a rational juror to conclude that a successful surveillance of any of the four targets would have resulted in an extortion, or a robbery, or a kidnapping "encompassed within the Hobbs Act."

The first target "Alex" was described as owning a Santeria botanica with 100 kilos of cocaine.  (R.382, at 1226–27).  The second target "Tony" was described as owning a clinic.  (R.382, at 1229).  The third target "Orestes" was described as owning a bar in Hialeah and as having drugs; this person had been robbed before of four kilos of cocaine.  (R.382, at 1230–31).  The fourth target, the unnamed woman

---

[38]*See* R.430, at 3369.

[39]However, such judicial declaration does not constitute a substitute for proof of the required interstate commerce nexus.

who lived in the Mango Hill section of Hialeah, was described as owning a medical clinic. (R.382, at 1232).

Even assuming that Lopez was the source of the information regarding the four targets, Ilvigio's testimony that the targets operated a bar or owned a clinic, is insufficient to establish the nexus to interstate commerce. Ilvigio provides no testimony to support a finding that a successful extortion or robbery of the four targets would have involved the necessary nexus with interstate commerce to establish a conspiracy within the requirements of the Hobbs Act. *See Farrell*, 877 F.2d at 875.

The remaining evidence upon which the government relies to establish proof of Lopez's involvement with the conspiracy as alleged in Count I is, at best, ambiguous or speculative regarding any involvement of Lopez in the charged conspiracy. The visits of Lopez to the residence of the Arias family do not establish involvement in the conspiracy. The telephone calls to the Diaz/Lopez residence on the day of the Idania Arias kidnapping are not directly connected to Lopez. The fact that Lopez is married to Diaz does not establish criminal culpability. The fact that Lopez, along with Diaz, was involved in the Santeria religion and was a godparent in the practice of that religion to Orestes Hernandez or victims of the kidnapping does not establish guilt. The remaining issue is whether a combination of the above factors, including the evidence that Lopez directed the active gang members to targets lacking

51

a nexus to interstate commerce, is sufficient to justify a Hobbs Act conspiracy violation. It is our conclusion, applying the *de novo* review function, that the evidence, when combined, fails to support the Lopez conviction for Count I.[40]

The predicate for the conviction of Lopez as to Count IV charging him with a substantive Hobbs Act violation is application of *Pinkerton* liability.[41] The *Pinkerton* analysis does not apply if the conviction of the underlying Hobbs Act conspiracy is

_____

[40]Since the uncorroborated testimony of Ilvigio does not establish the necessary nexus to interstate commerce, the Lopez appellate attack on the testimony of Ilvigio as being incredible or otherwise insubstantial, (*see Iacovetti, supra*), need not be addressed. However, we note that Lopez, in his own defense, introduced testimony by way of a stipulation tending to demonstrate that he was in New York City on December 24, 1995, the day Ilvigio recalled that he met Lopez.

[41]The district court's *Pinkerton* liability jury instruction follows:

> In some instances, a conspirator may be held responsible, under the law, for a substantive offense in which he or she had no direct or personal participation if such offense was committed by other members of the conspiracy during the course of such conspiracy and in furtherance of its objects.
>
> So, in this case, if you have first found a defendant guilty of the conspiracy offense as charged in Count 1 of the Indictment, you may also find such defendant guilty of any of the other offenses with which that defendant is charged, even if you find that such defendant did not personally participate in such offense if you find beyond a reasonable doubt three things:
>
> 1. That the offense charged in such count was committed by a conspirator during the existence of the conspiracy and in furtherance of its objects.
>
> 2. That the defendant under consideration *was a knowing and willful member of a conspiracy* at the time of the commission of such offense and;
>
> 3. That the commission of such offense by a coconspirator was a reasonable foreseeable consequence of the conspiracy.

R.458, at 4074–75 (emphasis added).

set aside. There was no testimony or evidence before the jury that was sufficient to enable a rational jury to find that Lopez was involved as a "tipster" with the Arias episode.[42] Consequently, following the dictates of *Jackson*, we conclude that there is insufficient evidence to support the conviction of Lopez for Count IV relating to the Arias kidnapping.

## V. Sufficiency of the Evidence as to the Carjacking Convictions of Orestes Hernandez, Echevarria, Camacho, and Munoz

Orestes Hernandez, Echevarria, Camacho, and Munoz challenge their carjacking convictions under 18 U.S.C. § 2119. Echevarria, Munoz, and Orestes Hernandez were convicted of the January 11, 1996 carjacking involving Idania Arias. Orestes Hernandez also was convicted, along with Camacho, of the November 13, 1996 carjacking in the Gonzalez episode. All four appellants argue the evidence was insufficient to convict them. More particularly, they argue the intent element of 18 U.S.C. § 2119 was lacking, and they challenge the finding that the vehicles were taken by force and violence or by intimidation. In addition, Orestes Hernandez and

---

[42]The presence report for Lopez sets forth a description of the criminal conduct and provides it was based on information supplied by the U.S. Attorney's office and agents of the FBI. Paragraph thirty-nine of the Lopez presence report describes alleged admissions by Lopez to FBI agents in January of 1997 regarding the Arias episode. However, to avoid a defense motion for severance, the government agreed, prior to the trial, not to introduce testimony concerning the alleged admissions. Consequently, the jury had no such evidence before it.

Echevarria challenge the finding that they participated in taking the vehicles. As with appellants' insufficient evidence claim involving the Hobbs Act violations, the issue of whether sufficient evidence was presented at trial to support appellants' convictions is a question of law subject to *de novo* review. *See U.S. v. Keller*, 916 F.2d 628, 633 (11th Cir. 1990).

"In order to be convicted of carjacking under 18 U.S.C. § 2119, the government must prove that the defendant (1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence or intimidation." *U.S. v. Applewhaite*, 195 F.3d 679, 684–85 (3d Cir. 1999) (internal quotation marks, citation and footnote omitted). The required mens rea for carjacking was later clarified by the Supreme Court in *Holloway v. U.S.*, 526 U.S. 1 (1999): "The intent requirement of [18 U.S.C. §] 2119 is satisfied when the Government proves that at the moment the defendant demanded or took control over the driver's automobile the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car[.]" *Id.* at 12. To uphold the convictions, the Court must conclude that there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Echevarria, Camacho, Munoz, and Orestes Hernandez intended to seriously harm or kill the driver if necessary to steal the car.

Appellants' primary argument is that the intent element is lacking. Appellants rely on *Applewhaite*, *supra* to support this argument. Appellants claim that, as in *Applewhaite*, their primary objective was to kidnap and rob their victims—not to steal their vehicles—and that they simply took their vehicles as a means of facilitating the kidnapping.

In *Applewhaite*, the evidence showed that the defendants' primary objective was simply to do serious harm to the victim and that the defendants took the victim's van as an afterthought in an attempt to get the victim's body away from the crime scene. Accordingly, we held that scienter was not established because, although the defendants clearly intended to seriously harm or kill the victim, their intent had no nexus to the taking of the victim's vehicle. *Applewhaite*, *supra* at 685. The Court, however, finds the present case clearly distinguishable from *Applewhaite*.

The evidence in this case shows that gaining control of the victims' vehicles was an important step in the extortion scheme and not a mere afterthought. In addition, the evidence reveals that resistance on the part of the victims exposed them to more harm. The evidence presented at trial with regard to the carjackings primarily came from Idania Arias, Armando Gonzalez, Ilvigio, and Escandell. Accordingly, the Court will review this evidence.

## A.    The Arias Episode

The evidence surrounding the carjacking of Idania Arias's Lexus establishes that both the intent element and the requirement of taking by force and violence or intimidation were established.  Idania Arias testified that she and her children were at their front door trying to unlock it when appellants approached her with guns drawn. The car sat parked in the driveway with the doors locked.  (R.382, at 1255; R.388, at 1670–71).  Ilvigio testified that Munoz and Echevarria got out with guns drawn and kidnapped Idania Arias while Ilvigio and Orestes Hernandez, also with guns drawn, kidnapped the children.  (R.382, at 1255).   After kidnapping Idania Arias and her children and putting them in the back of Echevarria's Jaguar, Munoz asked her which key went to her car.  (R.382, at 1255; R.388, at 1673).  Munoz drove out with Idania Arias's Lexus.  (R.382, at 1255).

The fact that Idania Arias was not in her car refutes appellants' argument that her car primarily served as a means to effectuate her kidnap.  In addition, no argument can be made that her vehicle impeded the kidnap because Echevarria's Jaguar was parked *behind* Idania Arias's Lexus in the driveway.  To convict appellants of carjacking, a rational jury must conclude beyond a reasonable doubt that appellants intended to seriously harm the victim if necessary to steal the car.  The evidence before the jury included the torture of Nelson Martin, a prior victim within this same

56

conspiracy scheme, and the fact that appellants had put duct tape on Idania Arias's eyes, wrists, and ankles and on Joseph Arias. This evidence is sufficient for a jury to conclude that the theft of the vehicle and the kidnapping were part of the same plan to extort money or rob the victims from which the jury could conclude that appellants would seriously harm the victims if necessary to steal their vehicles. The weapons brandished by appellants along with the fact that Idania Arias and her children were taken by force support a jury's finding that the vehicle was taken by force and violence. Orestes Hernandez's and Echevarria's arguments that the evidence was insufficient to show they participated in taking the vehicles is entirely lacking in merit. Although only Munoz drove away with Idania Arias's Lexus, force was exerted by all of them in order to steal her car. Accordingly, the carjacking convictions of Orestes Hernandez, Munoz, and Echevarria are upheld.

### B. The Gonzalez Episode

In the Gonzalez episode, appellants impersonated police by driving a white Chevrolet Caprice and using a blue flashing light to pull Armando Gonzalez over. Gonzalez testified that, after he was pulled over, he was approached by a gentleman in a police uniform who was pointing a revolver at him. (R.427, at 2634). Gonzalez was told he was under arrest and told to get out of the car. Gonzalez was thrown to

57

the ground and blindfolded. His mouth was covered and he was handcuffed. Negrin then drove off with Gonzalez's truck.

Escandell's testimony reveals that all of these events were meticulously calculated by appellants. On direct, Escandell provided vivid details of the kidnapping plan. Negrin and Escandell were in the Caprice and Camacho and Orestes Hernandez followed behind them in Orestes Hernandez's Ford Explorer. When Gonzalez pulled out of the driveway, Escandell and Negrin put the light on top of the car and pulled him over. Camacho put Gonzalez in the back seat of the Caprice, which Escandell was driving. Orestes Hernandez drove his Ford Explorer and Negrin drove Gonzalez's truck. Camacho rode in the back seat of the Caprice with Gonzalez. From there, the appellants drove to Camacho's house in a particular order—Escandell was in front in the Caprice, followed by Negrin in Gonzalez's truck and Orestes Hernandez in his Explorer. Escandell testified that there was a reason for this order:

> Since Mr. Gonzalez was in the first car, there was less possibility for a real police officer to stop us. So, it was us, then . . . Mr. Gonzalez's car was second so, then again, there was less possibility for him to get stopped and Vlademir [Negrin] get a ticket under the victim's car. And then the Ford Explorer was last so if by any chance it got stopped by a police officer, the car was fine and Hernandez had a license and everything was fine.

(R.428, at 2815–16).

Escandell's testimony reveals that the theft of Gonzalez's vehicle was an essential part of the extortion and robbery plan from the beginning. As with Idania Arias, there was no need for appellants to steal Gonzalez's vehicle. At the time the vehicle was taken, appellants already had control over Gonzalez. Appellants took Gonzalez by force and subsequently tortured him.

The question before the Court is whether a rational jury could conclude beyond a reasonable doubt that appellants, at the moment they demanded or took control over the driver's automobile, possessed the intent to seriously harm or kill Gonzalez if necessary to steal the car. Although not controlling, the Court finds instructive, as based on similar facts, the case of *U.S. v. Brown*, 200 F.3d 700 (10th Cir. 1999), *cert. denied*, 528 U.S. 1178, 120 S.Ct. 1213 (2000).

There were three defendants in *Brown*—Dixon, Brown, and McClelland. Their primary objective was to rob someone. After locating a target, they followed the victim who pulled into a driveway to drop his passengers off. The victim got out of his vehicle and said goodbye to his passengers. When he returned to his vehicle, the defendants had parked directly behind him. Before the victim could get into his vehicle, Brown cut him off, pointed a gun at him, and demanded his money and wallet. The victim complied. Brown then demanded his jewelry. Dixon then

instructed McClelland to get into the victim's vehicle. As the victim removed his jewelry, Dixon began hitting him on the right side of his face.

One of the issues before the *Brown* court was whether there was sufficient evidence to support the finding that defendants intended to cause death or serious bodily harm if necessary to steal the vehicle (*i.e.*, whether the intent element was met). In response, the court stated, "Mr. McClelland testified that part of the robbery plan was to take the victim's car, and, indeed, Mr. Dixon told Mr. McClelland to drive it away after Mr. Dixon struck the victim. This in itself is sufficient evidence of Defendants' state of mind for a rational jury to find intent." *Brown*, 200 F.3d at 705 (internal citations omitted).

Similarly, the taking of Gonzalez's vehicle was not appellants' primary objective. Rather, their primary objective was to kidnap him for purposes of extortion. The evidence before the jury reveals that appellants came at Gonzalez with weapons drawn, threw him to the ground, blindfolded him, handcuffed him, and then threw him into the back of the car. Negrin then drove off with Gonzalez's vehicle. Based on this evidence, the Court is satisfied that a rational jury could conclude beyond a reasonable doubt that appellants intended to cause serious bodily harm to Gonzalez if necessary to steal his vehicle.

## VI. Sufficiency of the Evidence as to the § 924(c) Convictions

Echevarria, Munoz, Camacho, and Orestes Hernandez were convicted of carrying and using a firearm during a crime of violence in connection with the Martin and Arias episodes. Camacho and Orestes Hernandez also were convicted of carrying and using a firearm during a crime of violence in connection with the Gonzalez episode. Only Camacho directly challenges these convictions.[43] Camacho argues the evidence was insufficient because the government did not charge him with aiding and abetting and the government provided no proof that Camacho used or carried any firearms. Neither argument has any merit.

The indictment charged a violation of 18 U.S.C. § 924(c) in Counts III, VI, VIII, and XI. Echevarria, Munoz, Camacho, Orestes Hernandez, Lopez, and Diaz were charged under Counts III (for the Martin episode) and VI (for the Arias episode). Camacho, Orestes Hernandez, and Negrin were charged under Count XI (for the

---

[43]The Court notes, however, that all appellants adopted the arguments raised by their co-appellants.

61

Gonzalez episode).[44]   In addition, aiding and abetting was charged in conjunction with the § 924(c) violations.

Pursuant to 18 U.S.C. § 924(c), it is unlawful for "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States" to use or carry a firearm or for any person "in furtherance of any such crime," to possess a firearm. *See* 18 U.S.C. § 924(c).  In *Bailey v. U.S.*, 516 U.S. 137, 142 (1995), the Supreme Court held that a conviction for "using" a firearm required proof of active employment of a weapon and that proof of mere possession was insufficient.  The Court, however, made clear that its decision was intended to give new life to the "carry" prong of § 924(c).  This intent was recognized by this Court in *Bazemore v. U.S.*, 138 F.3d 947, 950 (11th Cir. 1998).  The decision in *Bailey*, however, did not negate the applicability of the *Pinkerton* doctrine to § 924(c) cases.  *U.S. v. Bell*, 137 F.3d 1274, 1275 (11th Cir. 1998) (per curiam).  Accordingly, criminal defendants remain liable for the reasonably foreseeable actions of their coconspirators—including the using or carrying of a firearm during the

---

[44]Lopez and Diaz were not present for any of the kidnappings and Camacho was not present for the Arias kidnapping.  The government originally believed the only way it could convict appellants who were absent was by proving they aided and abetted in the commission of the crime. Realizing it was unable to prove this with regard to Lopez and Diaz, the government dismissed the counts against them.  Subsequently, the government became aware of the availability of *Pinkerton* liability.  At the close of evidence, the government moved to dismiss aiding and abetting from the § 924(c) charges.  Camacho's trial counsel objected.  *See* R.432, at 3628–41.

commission of a crime of violence. *See U.S. v. Bell*, 137 F.3d 1274, 1275 (11th Cir. 1998) (holding that coconspirator liability for a § 924(c) offense may be established under *Pinkerton* liability).

At the close of evidence but before the jury was charged, the government amended the indictment, over Camacho's objection, removing the aiding and abetting language and relying solely on the *Pinkerton* instruction.[45] The district court noted that the government could withdraw its request to proceed on an aiding and abetting theory and that such withdrawal would not preclude the government from considering the § 924(c) charge under the *Pinkerton* theory. (R.432, at 3632).[46] We agree.

It does not follow that, because the government could not prove that appellants aided and abetted in the commission of a § 924(c) violation, no such violation occurred. On the contrary, because this Court, along with a number of other courts, recognizes the application of the *Pinkerton* doctrine to establish a substantive violation of § 924(c), a person not present when the offense was committed need not be an aider and abetter in order to be found guilty of carrying or using a firearm during the commission of a violent crime. Rather, an absent conspirator may be found

---

[45]Camacho's argument appears to be based on the incorrect belief that aiding and abetting is a separate offense. On the contrary, 18 U.S.C. § 2 only abolishes the common law distinction between principals and accessories. *See U.S. v. Scroger*, 98 F.3d 1256 (10th Cir. 1996).

[46]The district court conducted a lengthy hearing discussing the relinquishment of aiding and abetting as a theory for prosecution. (R.432, at 3628–41).

guilty of violating § 924(c) if the carrying or using of a firearm by a coconspirator is a reasonably foreseeable action of the conspiracy. Camacho's objections to the dismissal of the aiding and abetting charges and to the government's sole reliance on *Pinkerton* liability for the § 924(c) charge are groundless. There was no error on the part of the district court in its instruction of the jury regarding *Pinkerton* and aiding and abetting. Accordingly, Camacho's convictions for carrying and using a firearm during the three episodes will be upheld absent proof that such use during the Arias episode was not foreseeable.

Camacho was present during the kidnappings of both Nelson Martin and Armando Gonzalez. The Arias kidnapping fell in between these two episodes. There is no dispute that Camacho was not present during the Arias kidnapping. He was called after Idania Arias and her children had been kidnapped, and he went to the garage where Idania and her children were taken. From that point on, Camacho fully participated.

As discussed previously, Camacho can be found guilty of carrying or using a firearm during the commission of a violent crime with respect to the Arias kidnapping if it is reasonably foreseeable that his coconspirators would carry or use a firearm. The evidence before the jury established that weapons were used during both the Martin and Gonzalez kidnappings establishing that such use was part of the scheme.

64

In fact, there is no evidence to support Camacho's argument that he did not foresee that his coconspirators would commit such offenses and use firearms during their commission.

Camacho's final argument is that he was not a member of the conspiracy and, hence, cannot be found guilty of the acts of the other appellants. The Court, however, has determined that Camacho knew of the conspiracy and was a voluntary participant. Accordingly, this is a losing argument and appellants' § 924(c) convictions are affirmed.


## VII. Procedural and Pretrial Issues

### A.    Severance, Mistrial, and Improper Joinder Issues

#### 1. Severance

Echevarria argues that the district court abused its discretion in denying his motion for severance.[47] He contends that the jury was unable to sift through the evidence and make an individualized determination as to each defendant. Echevarria adds that severance was necessary due to the improper joinder of defendants and offenses.

---

[47]Lopez also makes a similar argument. In view of our decision vacating the Lopez convictions, we need not address Lopez's claim.

The Court has placed a heavy burden on a defendant who seeks to obtain a reversal on the basis of the denial of a severance motion.

> The prevailing attitude is that persons who are charged together should be tried together. This is based largely on the desire to avoid multiple litigation and to conserve judicial resources. The granting or denial of a severance is within the discretion of the trial judge, and will be overturned only for abuse of discretion. In order to show that the trial judge abused his discretion in failing to grant a severance, the appellant must demonstrate that the denial of a severance resulted in specific and compelling prejudice against which the trial court was unable to afford protection. Only if the jury could not separate the evidence relevant to each appellant and render a fair and impartial verdict as to each should severance be granted.

*U.S. v. Butler*, 792 F.2d 1528, 1534 (11th Cir. 1986) (internal citations omitted). The jury's ability to reach different verdicts as to different defendants is one factor that signifies the jury's ability to make individualized determinations. *See, e.g.*, *U.S. v. Starrett*, 55 F.3d 1525, 1553 (11th Cir. 1995). In evaluating the district court's denial of severance, we are mindful of the fact that "the Constitution does not guarantee a trial free from the prejudice that inevitably accompanies any charge of heinous group crime; it demands only that the potential for transference of guilt be minimized to the extent possible under the circumstances . . . ." *Id.* (quoting *U.S. v. Elliott*, 571 F.2d 880, 905 (5th Cir. 1978)).

Echevarria also alleged prejudice resulting from a "spill-over" effect. Accordingly, he must demonstrate the jury's inability to make an individualized determination as to each defendant. *See Butler*, 792 F.2d at 1534. Echevarria's main argument is that evidence relating to Counts VII through XI for acts that occurred after Echevarria had been arrested, resulted in compelling prejudice. This argument is unconvincing. Echevarria was not charged with any of those counts, and the evidence against him relating to Counts I through VI was more than overwhelming. In addition, the court ordered the government to announce against whom the evidence was offered, and the court issued a limiting instruction with regard to the evidence on Counts VII through XI stating that Echevarria, Munoz, Diaz, and Lopez had not been charged in those counts. (R. 427 at 2628–30). Under these circumstances, Echevarria has not made a sufficient showing of compelling prejudice.

## 2. Mistrial

Echevarria argues that the following events warranted a mistrial: (1) the introduction of evidence regarding the type of ammunition recovered from coconspirator Munoz's home; (2) testimony that it is illegal for a convicted felon to possess ammunition; (3) prosecutorial misconduct; and (4) the inclusion of facts not in evidence in the government's closing argument.

We review the district court's refusal to grant a mistrial for abuse of discretion. If a district court issues a curative instruction, we will reverse only if the evidence "is so highly prejudicial as to be incurable by the trial court's admonition." *U.S. v. Trujillo*, 146 F.3d 838, 845 (11th Cir. 1998) (quoting *U.S. v. Funt*, 896 F.2d 1288, 1295 (11th Cir.1990)).

Echevarria argues that the testimony regarding the type of ammunition found in Munoz's home and the fact that convicted felons cannot possess ammunition was elicited for the improper purpose of prejudicing the appellants. We disagree. The district court heard arguments from both the government and defense counsel and found that such testimony was relevant to issues in the case. In addition, it was defense counsel that opened the door to the question of whether it was illegal to possess ammunition.

Echevarria's final argument for mistrial relates to the government's actions. Echevarria claims a mistrial should have been granted when the government started to laugh at the defense when a witness stood up and began to gesture in response to a defense question. An examination of the record reveals that on cross-examination, Idania Arias was questioned about her identity of Sergio Echevarria as "cat eyes." This question apparently triggered something inside of her and she stood up gesturing towards Echevarria and speaking in Spanish. Before an interpretation was given,

68

counsel for Echevarria objected that her answer was nonresponsive—although he was unable to understand what the answer was since he did not speak Spanish. The government did not understand what her answer was and began to laugh when counsel for Echevarria objected because they knew he did not know what had been said. The district court issued an admonishment, which was sufficient in curing any prejudice to appellant.

### 3. Misjoinder

Echevarria argues that his convictions should be reversed because the district court improperly permitted joinder of defendants and unrelated offenses in the same indictment. Reversal based on improper joinder is only required if "it results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *U.S. v. Dominguez*, 226 F.3d 1235, 1238 (11th Cir. 2000). The question of whether initial joinder of offenses is proper under Fed. R. Crim. P. 8 is to be determined by the trial court before trial. This determination is made by examination of the allegations stated on the face of the indictment. *See id.*

Based on a review of the indictment, it is apparent that there was no misjoinder of offenses. The offenses charged include the conspiracy and the substantive Hobbs Act violations. In addition, the counts relating to the carjackings and the use of

69

firearms are included. The offenses charged in Counts II through XI constitute a series of acts committed in furtherance of the overall conspiracy as charged in Count I and, hence, were properly joined under Rule 8(a). Moreover, because the offenses as alleged in the fourth superseding indictment were factually similar and those allegations show a substantial overlap of participants, the joinder of parties also was proper under Rule 8(b).

**B.      In-Court and Out-of-Court Identifications**

Munoz challenges his conviction based on the in-court and out-of-court identifications made by Idania Arias. Munoz claims that the district court violated his constitutional rights when it admitted evidence of an out-of-court identification and allowed an in-court identification allegedly based on unduly suggestive government procedures.

This Court employs a two-step analysis in assessing the constitutionality of a trial court's decision to admit an out-of-court identification. *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988). First, we must determine whether the original identification procedure was unduly suggestive. If we conclude that it was suggestive, we then must consider whether, under the totality of the circumstances, the identification was nonetheless reliable. *Id.* (citing *Neil v. Biggers*, 409 U.S. 188, 199

70

(1972); *Dobbs v. Kemp*, 790 F.2d 1499, 1506 (11th Cir. 1986)). Factors to be considered in determining whether the identification was reliable include: (1) opportunity to view; (2) degree of attention; (3) accuracy of the description; (4) level of certainty; and (5) length of time between the crime and the identification. *Neil v. Biggers*, 409 U.S. at 199.

The district court concluded that the identification procedure was not impermissibly suggestive. This conclusion is subject to a clearly erroneous standard. *See Cikora*, 840 F.2d at 896; *cf. id.* at 895 (stating that "[t]he district court's *ultimate* conclusion, taking into consideration the five factors of the *Neil v. Biggers* test, that [the defendant] was not deprived of due process by the admission of the out-of-court identification, is subject to plenary review as a mixed question of fact and law.").

We cannot conclude that the district court was clearly erroneous when it held that the pretrial identification procedure was not impermissibly suggestive. First, we disagree that the facts surrounding the out-of-court identification by Idania Arias are similar to the facts in *Foster v. California*, 394 U.S. 440 (1969). The identification procedure in *Foster* consisted of an initial lineup in which the petitioner stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber. Since no identification was made, the police permitted a one-to-one confrontation between the petitioner and

71

the witness, which resulted in a tentative identification. A final lineup was arranged in which the petitioner was the only person who had appeared in the first lineup.

In this case, the initial lineup prepared by the FBI was shown to both Idania Arias and Joseph Arias, but it was shown to them separately. Joseph Arias was able to make a positive identification, but Idania Arias did not. Approximately two weeks later, police visited Idania Arias and showed her another lineup. Again Joseph Arias and Idania Arias were shown the lineup separately and, again, Joseph Arias made a positive identification while Idania Arias did not. Almost six months later, based on a new photograph the FBI obtained of Munoz, Idania Arias was shown another lineup. This time she was able to positively identify Munoz. In addition, she was able to identify Munoz in court.

Based on the foregoing, we do not find the district court's decision that the identification procedures were not impermissibly suggestive to be clearly erroneous.[48]

## C.    Enforcement of the District Court's Sequestration Order

---

[48]Munoz also contends that Idania Arias's in-court identification of him violated his due process rights. Assuming for the sake of argument that the in-court identification violated due process, Munoz's contention is not a sufficient ground for reversal of his conviction. The admission of unreliable identification is subject to harmless error analysis. *Marsden v. Moore*, 847 F.2d 1536, 1546 (11th Cir. 1988). After reviewing the overwhelming evidence against Munoz, we are left with no doubt that the jury would have convicted him even absent the purportedly unreliable in-court identification.

Echevarria maintains that the district court erred in failing to grant a mistrial or, alternatively, to strike the testimony of the government's witnesses following violations of the court's sequestration order. According to Echevarria, the government met and spoke with Ilvigio, allowing him to help guide its case, and, after being admonished for doing so, the government later improperly spoke with Nelson Martin.[49] The alleged violation of the sequestration order with regard to Martin occurred when the government was permitted to reopen its case to insure that Nelson would testify that Echevarria had a gun in his possession as described in Count III. The government's response to Echevarria's argument is that there was no showing of prejudice because both witnesses were available for cross-examination.

The Supreme Court in *Geders v. U.S.*, 425 U.S. 80, 87 (1976) stated that the judge's power to control the progress and the shape of the trial includes broad power to sequester witnesses before, during, and after their testimony. When a violation of the sequestration rule occurs, the court may respond in one of three ways: (1) it may cite the guilty party for contempt; (2) it may allow opposing counsel to cross-examine the witnesses as to the nature of the violation; or (3) where counsel or the witness

---

[49]The violation that occurred involving Ilvigio will not be addressed. In response to the violation of the sequestration order, the court allowed defense counsel to inquire of Ilvigio about the contact in front of the jury and to argue it during closing. In addition, the court gave the government a strong admonishment. (R.388, at 1448–49). When asked if any additional relief was requested, no one responded. (*Id.*). A mistrial was never requested. Accordingly, there is no denial of a motion for mistrial for this Court to review.

violate the rule intentionally, the court may strike testimony already given or disallow further testimony. *U.S. v. Lattimore*, 902 F.2d 902, 904 (11th Cir. 1990). "The district court's denial of a mistrial for violation of the sequestration rule is . . . a matter of discretion and reversible only on a showing of prejudice." *Id.* (quoting *U.S. v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986) (citing *U.S. v. Womack*, 654 F.2d 1034 (5th Cir. 1981)).

We find that the violation of the sequestration order resulted in no prejudice. Echevarria argues that the district court erred by allowing Nelson Martin to be recalled to the stand more than two weeks after his initial testimony to clarify what he meant by his testimony that he was physically taken by "armed" men. Just prior to Martin's being called to the stand, the government spoke with Martin and asked him what the kidnappers had held in their hands. Martin responded "guns." Counsel for Echevarria then moved to exclude the testimony of Martin. (R.430, at 3133). The court determined that the violation of the order was not in bad faith, particularly since Nelson was recalled for only a specific purpose—to clarify the meaning of "armed." Following the direct examination of Martin regarding the meaning of "armed," defense counsel were able to cross examine Martin. During cross examination, defense counsel brought out the fact that, although the pistols existed two weeks ago

74

when Martin originally testified, he never explicitly referenced them. Accordingly, we find no prejudice.

## VIII. Sentencing Issues

### A. Introduction

The sentences were imposed by the district court and briefs filed by the appellants prior to the issuance of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000). As a consequence, several of the appellants have raised *Apprendi* issues by way of supplemental briefs. Initially, we observe that the government, in its supplemental brief filed on January 3, 2001,[50] has identified an error as to the sentencing of Orestes Hernandez and Camacho with respect to their carjacking convictions as alleged in Count X. The court imposed twenty-five year sentences on both Orestes Hernandez and Camacho for these convictions. Although the fourth superseding indictment charged Orestes Hernandez and Camacho with simple carjacking under 18 U.S.C. § 2119(1), they were sentenced under 18 U.S.C. § 2119(2), which requires the additional statutory element that serious bodily injury resulted from the carjacking.[51] As the indictment failed to allege that required element

---

[50]Oral argument was conducted in this case on November 7, 2000.

[51]The maximum sentence under 18 U.S.C. § 2119(2) is twenty-five years while the maximum under 18 U.S.C. § 2119(1) is fifteen years.

under 18 U.S.C. § 2119(2), the sentences for Orestes Hernandez and Camacho must be vacated and remanded for resentencing under the provisions of 18 U.S.C. § 2119(1).

Because we vacate and remand the sentences of Orestes Hernandez and Camacho for resentencing without reference to serious bodily injury, their *Apprendi* argument is moot. Moreover, contrary to the appellants' claims, Sentencing Guideline issues are not subject to the *Apprendi* rule and, thus, there is no requirement that sentencing facts be submitted to a jury and found beyond a reasonable doubt. *See U.S. v. Harris*, No. 00–14200, (11th Cir. decided March 14, 2001). Thus, Echevarria's *Apprendi* argument likewise has no merit.

**B.    Guideline Issues Raised by the Appellants**[52]

---

[52]Although only Echevarria and Orestes Hernandez raise issues regarding the Sentencing Guidelines in their supplemental briefs, these issues were also raised in their original briefs, which, pursuant to Fed. R. App. P. 28(i), were adopted by Camacho and Munoz. Accordingly, the Court addresses this matter as it relates to all four appellants.

Echevarria, Munoz,[53] Orestes Hernandez,[54] and Camacho[55] object to the five-level weapon enhancements taken with respect to counts charging robbery, Hobbs Act violations, and carjacking. The district court, in calculating the offense level for the appellants' respective convictions on counts charging a Hobbs Act conspiracy, substantive Hobbs Act violations, and carjacking, applied a five-level enhancement for the brandishing or possession of a firearm by a codefendant, which was consistent with its finding that another defendant also wielded a firearm and with the teaching of *U.S. v. Kimmons*, 965 F.2d 1001 (11th Cir. 1992), *cert. denied*, 506 U.S. 1086 (1993), *cert. granted*, *vacated by*, 508 U.S. 902 (1993). However, in light of the November 1, 2000 Amendment No. 599 to the Sentencing Guidelines, Orestes Hernandez, Camacho, Echevarria, and Munoz claim their sentences on these counts should be remanded.[56] The Court agrees.

---

[53]Echevarria and Munoz were convicted of two violations of 18 U.S.C. § 924(c) arising from the Martin and Arias episodes, which resulted in consecutive sentences totaling 25 years.

[54]Orestes Hernandez was convicted of three § 924(c) violations arising from the Martin, Arias, and Armando Gonzalez episodes, which resulted in consecutive sentences totaling 45 years.

[55]Camacho was convicted of four § 924(c) violations arising from the Martin, Arias, Rosa Gonzalez, and Armando Gonzalez episodes, which resulted in consecutive sentences totaling 65 years.

[56]The government's response to appellants' discussion of the impact of the new Sentencing Guideline amendments was to ask the Court to strike that portion of appellants' briefs.

The Presentence Investigation Report ("PSI") of Echevarria illustrates the double counting issue raised by all four appellants. In determining the offense level for the Hobbs Act conspiracy charged in Count I and the substantive Hobbs Act violation charged in Count II, the PSI provides as follows:

> [N]o enhancement for the gun carried by Sergio Echevarria will be made. However, Sergio Echevarria was one of two defendants who carried a gun during this crime of violence. Since a coconspirator and codefendant carried a firearm that was brandished, displayed, or possessed, the offense level is increased by five levels in accordance with §2B3.2(b)(3)(A)(iii).

(PSI of Echevarria, ¶69). Although the language may vary, the same reasoning was used with regard to all counts charging Echevarria, Camacho, Munoz, and Orestes Hernandez with either Hobbs Act conspiracy, substantive Hobbs Act violations, or carjacking.

Amendment 599 to the Sentencing Guidelines affects the Commentary to U.S.S.G. §2K2.4[57] captioned "Application Notes." Note 2 of the Application Notes, as amended, provides as follows:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when

---

[57]U.S.S.G. §2K2.4 addresses the offense conduct for the use of a firearm, armor-piercing ammunition, or an explosive during or in relation to certain crimes.

determining the sentence for the underlying offense. A sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Do not apply any weapon enhancement in the guideline for the underlying offense, for example, if (A) a co-defendant, as part of the jointly undertaken criminal activity, possessed a firearm different from the one for which the defendant was convicted under 18 U.S.C. § 924(c); or (B) in an ongoing drug trafficking offense, the defendant possessed a firearm other than the one for which the defendant was convicted under 18 U.S.C. § 924(c). However, if a defendant is convicted of two armed bank robberies, but is convicted under 18 U.S.C. § 924(c) in connection with only one of the robberies, a weapon enhancement would apply to the bank robbery which was not the basis for the 18 U.S.C. § 924(c) conviction.

U.S.S.G. §2K2.4, cmt. n.2.[58] The first sentence of the new application note reinforces what courts have always known—when a defendant is convicted of a § 924(c) violation and an underlying offense, the *defendant's* possession of a weapon cannot be used to enhance the level of the underlying offense. A review of the PSIs for Orestes Hernandez, Munoz, Camacho, and Echevarria reveals that no enhancement was applied to the underlying offense level as a result of the individual defendant's possession of a firearm. Accordingly, no error was made.

_____

[58]Prior to the November 1, 2000 amendment, Application Note 2 to U.S.S.G. §2K2.4 provided as follows:

Where a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of an explosive or firearm (e.g., §2B3.1(b)(2)(A)-(F) (Robbery)) is not to be applied in respect to the guideline for the underlying offense.

In a few cases, the offense level for the underlying offense determined under the preceding paragraph may result in a guideline range that, when combined with the mandatory consecutive sentence under 18 U.S.C. § 844(h), § 924(c), or § 929(a), produces a total maximum penalty that is less than the maximum of the guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. § 844(h), § 924(c), or § 929(a) (i.e., the guideline range that would have resulted if the enhancement for possession, use, or discharge of a firearm had been applied). In such a case, an upward departure may be warranted to that the conviction under 18 U.S.C. § 844(h), § 924(c), or § 929(a) does not result in a decrease in total punishment. An upward departure under this paragraph shall not exceed the maximum guideline range that would have resulted had there not been a count of conviction under 18 U.S.C. § 844(h), § 924(c), or § 929(a).

The second sentence of Application Note 2 as amended by Amendment 599 deals with the effect of Relevant Conduct. Pursuant to U.S.S.G. §1B1.3, relevant conduct includes, in the case of a jointly undertaken criminal activity (whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity. Accordingly, in the case at bar, relevant conduct of one appellant would include all reasonably foreseeable acts and omissions of every co-appellant found to be involved in the conspiracy. Courts have inconsistently applied U.S.S.G. §1B1.3, which provides for a five level enhancement where a firearm is brandished or possessed, in conjunction with U.S.S.G. §2K2.4.[59] More particularly, there has not been uniformity in regard to how the possession of a firearm by a codefendant affects the computation of the offense level for the underlying offense for which the defendant was convicted. The second sentence of Application Note 2, as amended by Amendment 599, addresses this issue.

The Commentary to §2K2.4, as amended, states that a sentence under U.S.S.G. §2K2.4 accounts for any weapon enhancement for the underlying offense of

---

[59]*See U.S. v. Gonzalez*, 183 F.3d 1315, 1325–26 (11th Cir.), *cert. denied*, 120 S.Ct. 996 (2000) (stating both statutory and guideline increases may be imposed if defendant and accomplice used different weapons as part of joint undertaking); *U.S. v. Willett*, 90 F.3d 404, 407–08 (9th Cir. 1996) (finding no double counting in applying both increases for separate weapons possessed by defendant). *But see U.S. v. Knobloch*, 131 F.3d 366, 372 (3d Cir. 1996) (stating it an error to apply guideline enhancement in addition to statutory penalty "even if the section 924(c)(1) sentence is for a different weapon than the weapon upon which the enhancement is predicated.").

conviction *including* any enhancement based on conduct for which the defendant is accountable under U.S.S.G. §1B1.3. Accordingly, relevant conduct cannot be used to enhance the offense level of the underlying offense. In the case at bar, the district court could not enhance the offense level for the Hobbs Act conspiracy, substantive Hobbs Act violations, and carjacking convictions of one appellant based on the fact that a co-appellant brandished or possessed a weapon. However, the PSIs called for appellants Orestes Hernandez, Camacho, Echevarria, and Munoz to receive the five level enhancement for the underlying offense conduct, and the district court properly denied the objections for the so-called "double counting" based on *Kimmons*, *supra*. However, by virtue of Amendment 599, the appellants are no longer subject to "double counting" or the teaching of *Kimmons*, *supra*, as Amendment 599 has been given retroactive status.[60]

With the retroactivity of Amendment 599 established, the provisions of U.S.S.G. §1B1.10 and 18 U.S.C. § 3582(c)(2) apply, resulting in a possible reduction of appellants' previously properly imposed sentence. Section 1B1.10 of the Sentencing Guidelines provides:

---

[60]U.S.S.G. §1B1.10 instructs the Court as to whether or not a reduction in the defendant's term of imprisonment is authorized as a result of an amendment to the Guidelines Manual. If the amendment is listed in subsection (c) of §1B1.10, a reduction is authorized. Amendment 599 is so listed.

(a) Where a defendant is serving a term of imprisonment, and the guideline range applicable to that defendant has subsequently been lowered as a result of an amendment to the Guidelines Manual listed in subsection (c) below, a reduction in the defendant's term of imprisonment is authorized under 18 U.S.C. § 3582(c)(2).

. . . .

(b) In determining whether, and to what extent, a reduction in the term of imprisonment is warranted for a defendant eligible for consideration under 18 U.S.C. § 3582(c)(2), the court should consider the term of imprisonment that it would have imposed had the amendment(s) to the guidelines listed in subsection (c) been in effect at the time the defendant was sentenced, except that in no event may the reduced term of imprisonment be less than the term of imprisonment the defendant has already served.

U.S.S.G. §1B1.10(a) & (b). The procedure for bringing the issue of a possible reduction of a previously properly imposed sentence before the district court is provided by 18 U.S.C. § 3582(c)(2):

[I]n the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(*o*), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, *the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.*

18 U.S.C. § 3582(c)(2) (emphasis added).

The Court has already concluded that the sentences of Orestes Hernandez and Camacho must be vacated and this case be remanded as to those appellants. Moreover, we construe the brief of Echevarria raising the issue of the application of Amendment 599 as a motion for the district court to revisit the sentences of Echevarria pursuant to 18 U.S.C. § 3582(c)(2). In addition, by adoption of each other's motions, the Court recognizes similar motions on behalf of Orestes Hernandez, Camacho, and Munoz. Accordingly, the district court must determine whether, and to what extent, a reduction in the term of imprisonment is warranted for these four appellants.

Consequently, the previously imposed sentences affected by the provisions of Amendment 599 are vacated and remanded for consideration in light of the amendment. In determining to what extent a reduction in the term of imprisonment is warranted, the district court should consider the term of imprisonment it would have imposed had Amendment 599 been in effect at the time the appellants were sentenced along with the discretion vested in the district court by Application Note 3 to U.S.S.G. §1B1.10.[61]

_____

[61]Application Note 3 provides:

> Under subsection (b), the amended guideline range and the term of imprisonment already served by the defendant will limit the extent to which an eligible defendant's sentence may be reduced under 18 U.S.C. § 3582(c)(2). When the original sentence represented a downward departure, a comparable reduction below the

In light of the recent amendments to the Sentencing Guidelines, Echevarria's sentences as to Counts I, II, IV, and V, Orestes Hernandez's sentences as to Counts I, II, IV, V, VII, IX, and X, Camacho's sentences as to Counts I, II, IV, VII, IX, and X, Munoz's sentences as to Counts I, II, IV, and V are vacated and remanded for recalculation and reconsideration in accordance with Application Note 2 of U.S.S.G. §2K2.4 and Application Note 3 to U.S.S.G. §1B1.10.[62]

## IX.    Conclusion

The conviction and sentence for Gloria Diaz is AFFIRMED.  The convictions of Sergio Echevarria, Eladio Munoz, Orestes Hernandez, and Ismael Camacho are AFFIRMED.  The sentences of Orestes Hernandez and Camacho for their convictions

---

amended guideline range may be appropriate; however, in no case shall the term of imprisonment be reduced below time served. Subject to these limitations, the sentencing court has the discretion to determine whether, and to what extent, to reduce a term of imprisonment under this section.

U.S.S.G. §1B1.10, cmt. n.3.

[62]Echevarria also argues that his offense level was incorrectly increased by three based on the court's finding that the loss was more than $250,000 but less than $800,000.  The amount of money  demanded initially by the Arias kidnappers was $500,000.  U.S.S.G. § 2B3.1(b)(7) adds three levels where the "loss" is more than $250,000 but less than $800.000.  No money was obtained in the Arias episode.  However, we find that the "loss" was correctly determined by applying Application Note 3 to U.S.S.G. § 2B3.1(b)(7), which notes that valuation of loss is discussed in Commentary to § 2B1.1 (Larceny, Embezzlement and Other Forms of Theft).  U.S.S.G. §2B1.1 references §2X1.1 (Attempts...or Conspiracy), which states: "In an attempted theft, the value of the items that the defendant attempted to steal would be considered." U.S.S.G. § 2X1.1, cmt. n.2.  There is no dispute that the amount of ransom initially demanded was $500,000.  Accordingly, we find no error in the calculation of the loss.

of Count X are vacated and remanded for resentencing as directed by this opinion. The sentences of Orestes Hernandez for Counts I, II, IV, V, VII, IX, and X, the sentences of Camacho for Counts I, II, IV, VII, IX, and X and the sentences of Echevarria and Munoz for Counts I, II, IV, and V are vacated for resentencing consistent with Application Note 2 of U.S.S.G. §2K2.4 as amended by Amendment 599 and Application Note 3 to U.S.S.G. §1B1.10. The remaining sentences of Camacho for Counts III, VI, VIII, and XI are AFFIRMED. The remaining sentences of Orestes Hernandez for Counts III, VI, and XI are AFFIRMED. The remaining sentence of Echevarria for Count III is AFFIRMED. The remaining sentences of Munoz for Counts III and VI are AFFIRMED.

The convictions of Jose Blas Lopez are REVERSED, Lopez's sentence is VACATED, and this case is REMANDED to the district court to enter a judgment of ACQUITTAL and an order for the DISCHARGE of Jose Blas Lopez.[63]

---

[63] *See Burks v. U.S.*, 437 U.S. 1 (1978) (holding that the Double Jeopardy Clause precludes a second trial once the reviewing court finds the evidence legally insufficient and that the only just remedy is the direction of a judgment of acquittal).